# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Richter*, 2012 IL App (4th) 101025

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM J. RICHTER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-10-1025 |
| Filed | October 22, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In defendant's trial for the murder of the mother of his two children, the admission of some of the victim's hearsay statements to friends, family members, and coworkers did not violate section 115-10.2a of the Code of Criminal Procedure dealing with the admission of prior statements in domestic violence prosecutions or defendant's right to confrontation. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 08-CF-1474; the Hon. Lisa Holder White, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Gary R. Peterson, all of State Appellate Defender's Office, of Springfield, for appellant.

Jack Ahola, State's Attorney, of Decatur (Patrick Delfino, Robert J. Biderman, and Anastacia R. Brooks, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice Appleton concurred in the judgment and opinion.
Justice Pope specially concurred in the judgment, with opinion.

## OPINION

¶ 1    In October 2008, the State charged defendant, William J. Richter, with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)). In August 2010, the State filed a motion *in limine*, seeking to admit numerous statements the victim made to others pursuant to section 115-10.2a of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.2a (West 2010)). Following a September 2010 hearing, the trial court granted the State's motion as to the majority of the statements, excluding only some statements that the victim made to two coworkers. Following an October 2010 trial, a jury convicted defendant of one count of first degree murder. The court later sentenced defendant to 75 years in prison.

¶ 2    Defendant appeals, arguing that the trial court abused its discretion by granting portions of the State's motion *in limine*. Specifically, defendant contends that (1) the court erred by admitting numerous hearsay statements the victim made to friends, family members, and coworkers under section 115-10.2a of the Code, and (2) the court's decision to admit numerous hearsay statements violated his sixth amendment right to confrontation.

¶ 3    We disagree and affirm.

¶ 4                                   I. BACKGROUND

¶ 5    In October 2008, the State charged defendant with three counts of first degree murder, alleging that on Sunday, August 24, 2008, defendant, while armed with a firearm, shot the mother of his two children, Dawn Marquis, in the head, killing her. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2008); 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2008) (text of section effective until June 1, 2009).

## A. The State's Motion *in Limine*

In August 2010, the State filed a motion *in limine*, seeking to admit numerous hearsay statements Dawn made primarily to friends, family members, and coworkers. The State's motion (1) listed each witness who would offer hearsay testimony and (2) identified each hearsay statement of Dawn the State sought to elicit from that witness and to admit under section 115-10.2a of the Code. That section permits the admission of hearsay statements by certain persons in domestic violence prosecutions when the declarant is unavailable to testify. Specifically, the State sought to introduce Dawn's hearsay statements at defendant's trial to show (1) defendant intended to kill Dawn and (2) defendant's motive for doing so.

### 1. *The State's Evidence at the Hearing on the Motion in Limine*

At the September 2010 hearing on the State's motion *in limine*, the State presented the following evidence:

#### a. Dawn's Statements to Her Mother, Norma

Norma Marquis, Dawn's mother, testified that Dawn lived with defendant for 17 years and had two children by him during their relationship, 17-year-old Dalton Marquis and 15-year-old Crystal Marquis. (Dawn had two other adult children from a previous relationship, Amanda Carter and Cory Marquis.) In August 2008, Dawn told Norma, with whom she was then residing, that she had left defendant because she could no longer tolerate his physical, mental, and verbal abuse. Norma testified that Dawn told her that Dawn was in the process of obtaining an apartment for herself, Dalton, and Crystal, but defendant would not agree to relinquish custody of their children.

#### b. Dawn's Statements to Her Son Cory

The State introduced an August 4, 2008, recording of a conversation between Dawn and Cory that took place while Cory was incarcerated in the Illinois Department of Corrections. During their conversation, Dawn told Cory, in part, that (1) she was moving from defendant's home and (2) defendant threatened to kill her.

#### c. Dawn's Statements to a Therapist

On August 7, 2008, Timothy Moore, a psychological therapist, met individually with Dawn and defendant in an attempt to help them reconcile their relationship. Dawn informed Moore that she intended to leave defendant. Dawn explained that she was afraid of defendant because of his "radical" mood swings, recounting that the previous weekend defendant had grabbed her by her hair and threatened her, as follows: " 'If you leave, we might as well both die.' " Dawn also told Moore that (1) defendant's will left their children to his sister, (2) she intended to rent an apartment for her children, and (3) she had started a relationship with a younger man, which she characterized as " 'not about sex but about someone caring for her.' "

### d. Dawn's Statements to Her Neighbors

#### i. *Kimberly Smith-Chandler*

In June 2008, Dawn told Smith-Chandler, who was a neighbor, that she had to move out of the home she shared with defendant. Smith-Chandler noted that Dawn was committed to leaving defendant but was afraid to do so because Dawn believed defendant would kill her.

#### ii. *Rhonda Willis*

In April 2008, Willis–a branch manager for a temporary employment agency and Dawn's neighbor–assisted Dawn in obtaining employment. On Thursday, August 21, 2008, Willis spoke with Dawn about an electronic mail message (e-mail) that was sent to the agency's corporate office, purportedly from Dawn, admitting illegal drug use and expressing anger at her fellow employees. Dawn informed Willis that she had not sent the e-mail and conveyed her frustration that defendant was attempting to ruin her plans to begin a new life. Dawn told Willis that defendant had threatened to kill her "many times." Specifically, Dawn stated that, "I'm telling everybody I know that it will happen, and [defendant] may not do it, but he will have somebody do it if he does not do it." Dawn explained to Willis that she was constantly "looking over [her] shoulder" because she was afraid of defendant.

### e. Dawn's Statements to Her Work Supervisor

Candy Petersen testified that she became Dawn's work supervisor three months before her death. Petersen stated that, initially, Dawn was a "faithful" employee who came to work on time and would work late when required. About four weeks before Dawn's death, Petersen noticed a change in Dawn's mood in that she became upset, nervous, and afraid, and began crying at work. After Dawn left the apartment she shared with defendant and moved in with her mother, Dawn confided in Petersen that she believed defendant was going to kill her because she was planning to move into her own apartment. The day before her death, Dawn became "very nervous" when explaining to Petersen that she met defendant the previous night and he asked her to come back. When Dawn responded that she was moving into her own place, defendant made a gesture with his hands–representing a gun–and told her, " 'You're dead.' " Peterson also stated that either Dalton or Crystal told Dawn that defendant "had gotten passports to leave the country." Peterson added that she provided police a statement shortly after Dawn's death, in which she stated that Dawn told her she found passports for defendant, Dalton, and Crystal.

### f. Dawn's Statements to Her Coworkers

#### i. *Ashley Collins*

Collins, one of Dawn's coworkers, testified that in June 2008, Dawn began speaking to her about her relationship with defendant, which Collins noted was "never positive." Collins described an argument that occurred after Dawn returned from the grocery store because defendant believed that she had been gone too long. Dawn also told Collins that defendant was "stalking her" in that she suspected defendant was following her after she left her home

to go to work. Approximately three weeks before her death, Dawn told Collins about her plans to leave defendant and move into her own apartment. Dawn wanted to take her children with her, but defendant would not allow it. Collins noticed that Dawn became upset because she feared defendant would kill her if she carried out her plans. Collins recalled that the day before her death, Dawn was extremely upset, stating that "something bad was going to happen to her," but Collins did not inquire further. Collins further recalled an incident in which Dawn told her that she had found passports for defendant, Dalton, and Crystal.

¶ 26                                 ii. *Sonny Tulop*

¶ 27    After meeting Dawn at work, Tulop began a dating relationship with Dawn that became intimate. Approximately three weeks before her death, Dawn told Tulop that defendant threatened to kill her if she continued seeing him.

¶ 28                                 iii. *James Bird*

¶ 29    The day before her death, Dawn told Bird that she had dinner with defendant the previous night, and he asked her to return home. When Dawn refused, defendant made a gesture with his hand, representing a gun, pointed to Dawn, and said, " 'Bang, bitch,' " " 'It's on,' " or " 'You're dead.' " Dawn also told Bird that she did not believe defendant could kill her but that defendant would hire someone to murder her. Dawn planned to leave work early because she believed defendant had someone following her. Bird added that Dawn appeared scared.

¶ 30                                 iv. *Eddie Long*

¶ 31    Long first met Dawn at work and knew defendant from his childhood, but he had not continued that friendship. In early August 2008, Long received a telephone call from defendant. Defendant first asked Long if his phone was being "tapped or recorded." After Long said no, defendant then asked him if he knew of anyone at Dawn's work that drove a green pickup truck. Long told defendant that he did not. The day before Dawn's death, Dawn told Long that she was upset because she believed defendant was attempting to sell a car to raise money to have her killed.

¶ 32                                 v. *Marcus McKnight*

¶ 33    Sometime during her employment, Dawn approached McKnight crying, stating that she was afraid to go home because something was going to happen. McKnight could not recall the date of their conversation.

¶ 34               g. Dawn's Statements to the Apartment Complex Manager

¶ 35    Kari Kavanaugh testified that on Thursday, August 21, 2008, Dawn inquired about renting a two-bedroom apartment for herself and her two children. Dawn explained that she was late for their appointment because she had to resolve an issue regarding a work e-mail. Dawn told Kavanaugh that she did not want defendant to know that she was renting an

apartment. Kavanaugh's impression was that Dawn was afraid of defendant based on her actions, but she acknowledged that Dawn did not specifically tell her that she was afraid.

¶ 36                          h. Dawn's Text Message to Her Daughter

¶ 37        Decatur police department Detective Charles Hendricks testified that during his investigation of Dawn's death, he questioned Crystal about a telephone text message she received from Dawn the evening prior to Dawn's death. Dawn's message read, as follows:

> "I got you [*sic*] message, but I can't talk to [defendant]. All we do is argue. He becomes angry and starts threatening me. Well, enough of that. Do you have a softball game tournament tomorrow and when[?]"

Hendricks (1) confirmed that Crystal had a softball game the following day and (2) noted that he did not personally verify that the text message originated from Dawn's phone.

¶ 38              i. Dawn's Recorded Message to Her Attorney's Answering Machine

¶ 39        On Friday, August 22, 2008, Jennifer Golladay, the secretary for attorney Guy Casey, answered a phone call from a male caller, inquiring as to whether Dawn had made it to her appointment with Casey, which had occurred earlier that day. On the morning of Monday, August 25, 2008–the day after Dawn's death–Golladay listened to messages that had been left on Casey's business telephone voicemail during the weekend. The following message was received on Saturday, August 23, 2008:

> "Hi, I'm trying to reach Mister Casey. This is Dawn Marquis. I am leaving him a message. The person who called, claiming to be my father was not my father. Also [defendant] is threatening me with paying people from out of town to take care of me and the guy I was with. My son called me late last night and said that [defendant] was giving his cars away to some people out of Chicago and said he was acting crazy, so, yeah, [defendant] drove by me and held his fingers up and pointed at me and made a gesture like a gun so I am feeling very, very threatened right now and so just give me a call when you get a chance. Thanks."

(Dawn's father, Dwight Marquis, testified that he did not call Casey.)

¶ 40                    2. *Defendant's Evidence at the Hearing on the*
                       *Motion in Limine and the State's Rebuttal*

¶ 41        In his written response to the State's motion *in limine*, defendant provided separate summaries of interviews police conducted with Dalton on Sunday and Monday, August 24 and 25, 2008, to show that the hearsay statements of Dawn that the State sought to admit were not reliable. At the hearing on the State's motion *in limine*, defendant informed the trial court that in the interest of judicial economy, the State had agreed to permit defendant to introduce the summaries in lieu of Dalton's testimony. In exchange, defendant agreed not to object to the State's introduction of a recording, showing an August 25, 2008, interview that police conducted with Dalton. The court accepted the parties' agreement.

¶ 42    The Sunday, August 24, 2008, synopsis of Dalton's statements to police recounted that Dalton (1) was not aware of any physical violence between defendant and Dawn, and (2) "had never heard [defendant] threaten Dawn." The Monday, August 25, 2008, synopsis, stated in pertinent part, the following:

> "Notwithstanding statements by Dawn *** to both *** Collins and *** Peterson that Dalton had told her that he had overheard [defendant] talking to some guys from Chicago, offering to give away a car if they would kill Dawn, Dalton states that he never heard [defendant] say that and that he (Dalton) never said anything to Dawn like that. He reiterated in the same statement when asked, if on that day he had heard [defendant] say anything to Dawn about shooting her or having her shot 'he never heard [defendant] say anything like that.' When asked in the same statement 'if he ever heard [defendant] say anything to indicate he would compensate someone for causing some kind of harm to Dawn, or ever heard [defendant] make any kinds of threats to Dawn" Dalton stated 'he had never heard any of this'."

(Collins' testimony at the hearing on the State's motion *in limine* did not include any evidence regarding "guys from Chicago.")

¶ 43    In rebuttal, the State played for the trial court the Monday, August 25, 2008, recording of Dalton explaining to police, in part, that defendant made him call Dawn and falsely claim that defendant was "acting crazy" and giving away his cars to men from Chicago.

¶ 44                              3. *The Parties' Arguments to the Trial Court*

¶ 45    After the presentation of evidence, the trial court sought clarification on the specific statements the State sought to admit under section 115-10.2a of the Code, as follows:

> "THE COURT: [Section 115-10.2a] applies to statements that are not specifically covered by any other hearsay exception. *** [The court does not] think [the State] get[s] to, under this section, argue in the alternative. *** [C]ertainly, [the State] can say, [']we're going to ask that it be admitted for this purpose and [the State] think[s] there is an exception that applies.[']
>
> [THE STATE]: No. [The State is] saying that you have to show substantial guarantees *** of trustworthiness as other hearsay exceptions.
>
> THE COURT: Right.
>
> [THE STATE]: So *** section [115-10.2a] would not apply to [Dawn's] statements she was going to get an apartment. Those [statements] would come in under the state of mind [exception]. What [the State is] saying is that the same type of statements that [Dawn is] making at the same time would have the same guarantees of trustworthiness because of this other recognized hearsay exception.
>                              * * *
> THE COURT: Okay. And tell [the court] specifically what statements you're referring to.
>                              * * *
> [THE STATE]: The statements that [Dawn] believed [defendant] was going to kill

-7-

her; that she was afraid of him; that he threatened to kill her."

¶ 46    Defendant argued, in part, that Dawn's statements should not be admitted under section 115-10.2a because they did not have "substantial guarantees of trustworthiness." In support of his argument, defendant contended that Dawn had been "living a lie" by "having an affair with someone other than her significant other with whom she had been living with for 17 years." Defendant also noted that (1) an official from the Department of Homeland Security concluded that passports were not issued to defendant, Dalton, or Crystal, which was contrary to Dawn's claim to her coworker, Collins, and her work supervisor, Peterson, and (2) Dalton expressly denied that he had called Dawn and told her that "he heard [defendant] say these [Chicago] guys were being hired to kill [Dawn] and get payment through automobiles."

¶ 47                        4. *The Trial Court's Decision*

¶ 48    The trial court took the matter under advisement and later issued a written order, in which the court identified the following factors it considered: (1) what motivation the specific witness might have to testify, (2) whether the statements were subject to cross-examination, (3) whether the statements were based on Dawn's personal knowledge, (4) the spontaneity of the statements, (5) the lack of motive to fabricate the statements, (6) whether there was consistent repetition, (7) whether Dawn was under duress or pressure when she made the statements, (8) whether Dawn recanted or reaffirmed her statements, (9) whether the statements were made in response to leading questions, (10) the time that elapsed between each incident and Dawn's statements about that incident to others, and (11) the existence of any reliable evidence that refuted Dawn's statements. After considering these factors under the totality of the circumstances, the court granted the State's motion *in limine* as to all the aforementioned statements except the statements Dawn made to Tulop and McKnight.

¶ 49                    B. The Evidence Presented at Defendant's Trial

¶ 50                        1. *The State's Evidence*

¶ 51    During defendant's October 2010 jury trial, the State presented the testimony of Norma, Willis, Petersen, Chandler, Collins, Bird, Long, Kavanaugh, Hendricks, and Golladay, all of whom testified consistently with their respective testimony at the hearing on the State's motion *in limine* concerning the specific statements Dawn made to each of them. With regard to the testimony provided by Collins, however, neither the State nor defendant elicited any testimony about the passports Dawn purportedly found.

¶ 52    Cory (Dawn's adult son) testified that on August 3, 2008, he called defendant at his home from prison. Thereafter, the State introduced a recording of Cory's conversation with defendant, which the State played for the jury. The recording contained, in part, the following.

¶ 53    Defendant informed Cory that (1) Dawn was traveling to visit him and (2) he needed Cory's help to identify Dawn's new boyfriend so that he could "beat the mother fucker down." Defendant stated that he had scheduled an appointment with a marriage counselor,

but if Dawn moved out of their home, he would die before he would lose custody of his children, Dalton and Crystal. When Cory asked defendant how he was going to maintain their standard of living without Dawn, defendant responded, as follows:

> "I'm probably gonna have to sell the house and, I, I am keepin' the kids, Cory. There's no doubt in my mind about that, or I'm goin' in the dirt. You understand? That's for sure. That's 125% for sure, on my life. I don't care if fuckin' 20 sergeants come in this mother fucker. I will fuckin' go bananas. I will torch this mother fucker and go after everybody. That ain't happenin' in this lifetime, Cory."

¶ 54    The State also played for the jury a recording of an August 4, 2008, conversation Cory had with defendant and Dawn, which showed, in part, the following.

¶ 55    Defendant informed Cory that Dawn was in the process of moving out, but she agreed to go to counseling. Cory then asked to speak with Dawn. Cory asked Dawn not to leave until he was there to assist her, but Dawn responded that she could not wait for him to be released from prison. Dawn explained that " '[e]very day [defendant] is in my face, [defendant is] threatening me every day.' " Dawn added that, " 'one minute [defendant is] sorry and the next minute he's all up in my face. [Defendant is] gonna kill my ass.' "

¶ 56    Moore (the therapist) testified that on August 7, 2008, he met individually with Dawn and defendant to attempt a reconciliation. Moore noted that Dawn had not made a definitive decision regarding whether she would reconcile with defendant, but Moore opined that Dawn "seemed to be leaning heavily toward not returning." Dawn told Moore that (1) defendant's mood would swing radically; (2) defendant had recently inflicted physical abuse that caused her to require stitches; (3) the previous weekend, defendant had grabbed her by her hair and told her that, " 'If you leave, we might as well both die' "; (4) defendant stated that his will left their children to his sister; (5) she no longer cared for defendant; and (6) she intended to rent an apartment for six months.

¶ 57    After their respective appointments had ended, defendant called Moore later that same day and asked him about Dawn's attitude toward reconciliation. Moore informed defendant that it was "highly doubtful" Dawn would return. Moore described defendant's demeanor as "afraid" and "needy." Moore also testified that Dawn did not tell him that defendant was attempting to kill her or that a substantial history of physical abuse existed during her relationship with defendant.

¶ 58    Casey (the attorney) testified that on August 18, 2008, he met Dawn for an initial legal consultation. Dawn explained to Casey that she was separating from defendant and was concerned about child custody and property issues. Four days later, Dawn retained Casey as her lawyer. Because Dawn expressed concern for her personal safety, Casey asked Dawn to consider obtaining an order of protection against defendant. The following Monday, Casey learned of Dawn's death and contacted police about the message Dawn left on his office voicemail.

¶ 59    Dalton (Dawn's minor son) testified that he called Dawn on August 22, 2008. Dalton could not remember the subject of the call, but he denied that he spoke to Dawn about defendant's giving his cars to "guys from Chicago" who were at defendant's home that night. Specifically, Dalton testified, as follows:

"[PROSECUTOR:] Do you recall telling [police] that it was not true that there were any guys at the house, but that [defendant] told you to call [Dawn] and tell her those things?

[DALTON: Defendant] was drunk that night.

\* \* \*

[PROSECUTOR:] Well, the question is, do you recall telling [police] that [defendant] put you up to telling those things to [Dawn]?

[DALTON:] No."

The State then introduced and played for the jury an August 25, 2008, recording of Dalton explaining to police that defendant made him call Dawn and falsely claim that defendant was "acting crazy" and giving away his cars to men from Chicago.

¶ 60    Amanda (Dawn's adult daughter) testified that she lived with Dawn and defendant until 2006. Prior to moving out, Amanda interacted daily with Joe Hoffman, who worked for defendant in his auto repair business. Amanda described Hoffman as an alcoholic who lived in a camper behind defendant's home. Defendant paid Hoffman for his work by (1) providing him a place to stay, (2) supplying him food, beer, cigarettes, and cellular phone service, and (3) driving him to various locations.

¶ 61    On Friday, August 22, 2008, Amanda called Dawn and asked if she would come to the local hospital emergency room because Amanda had suffered a seizure. As they waited for medical assistance, Dawn received a call from Dalton. Amanda overheard Dalton tell Dawn that defendant was at his home "acting crazy" but did not testify further to anything else Dalton may have said. Shortly thereafter, defendant called. Amanda overheard defendant accuse Dawn of lying when Dawn told him she was at the hospital. Defendant called a second time and asked Dawn when she was removing her belongings from his home. When Dawn responded that she would do so when she was ready, defendant ended the conversation. Five minutes later, defendant called a third time and told Dawn, " '[W]hen I see you, you're gonna be dead. I'm gonna shoot you.' " Dawn hung up without responding. Amanda noted that in July 2007, defendant owned a gun that he kept locked in a "safe box" in his room. Amanda also noted that defendant (1) owned a Chevy S-10 pickup truck and (2) stored several guns in the attic of his house.

¶ 62    Crystal (Dawn's minor daughter) testified that she had known Hoffman all her life. Crystal's testimony was consistent with Amanda's testimony regarding Hoffman's demeanor and lifestyle. Crystal stated that if defendant could not drive Hoffman where he wanted to go, Hoffman would ride his bike to his destination. Crystal considered Hoffman part of her family, noting that defendant and Hoffman acted like brothers.

¶ 63    On Saturday, August 23, 2008, Crystal spoke with Dawn and asked Dawn to drive her to her softball game, which was scheduled for 12:15 p.m. the next day. Dawn agreed, stating that she would call her as she approached defendant's residence.

¶ 64    The following morning, Crystal attempted to leave defendant's home and wait outside for Dawn. Defendant asked her to wait inside while he gathered Dawn's mail. After giving Crystal the mail, defendant asked her to play a game with him while she waited. Crystal

found defendant's request odd because he did not usually play games that early in the day. After playing one game, Crystal called Dawn, but her call went unanswered. Thereafter, Crystal spotted Dawn's car in the driveway with the driver's door open. Crystal got into Dawn's car and observed Dawn slumped over the center console. When she attempted to get Dawn's attention, she noticed blood flowing from Dawn's head. Crystal exited the car, flagged down friends who were driving to the softball game, and called the police.

¶ 65 James Reynolds testified that at approximately 9:15 a.m. on Sunday, August 24, 2008–the day Dawn was shot–he arrived at his mother's home, which was located across the street from defendant's residence. As he approached that home, Reynolds saw defendant, whom he grew up with, talking to Hoffman in the front yard of defendant's home.

¶ 66 Decatur police detective Andrew Hastings testified that he recorded the interview he conducted with defendant at the police station shortly after Dawn's death. During that interview, defendant was combative because Hastings questioned him regarding his relationship with Dawn, which defendant believed was irrelevant. Defendant agreed to submit to a gunpowder residue test and provided police the clothes he was wearing. Defendant denied any involvement in Dawn's shooting and refused to speak further with Hastings. (Defendant's videotaped interview was shown to the jury.) Hastings noted that Hoffman's name was mentioned several times during the course of his investigation. Hastings later learned that Hoffman was being held by police in Lakeland, Florida. Approximately one month after Dawn's death, Hastings traveled to Florida, took Hoffman into custody, and returned with him to Illinois.

¶ 67 Hoffman testified that he first met defendant in 1991, and shortly thereafter, defendant hired him as a mechanic. Initially, Hoffman paid defendant rent to live in a shed in the backyard of the home defendant shared with Dawn. Six months later, Hoffman began performing various chores, such as mowing, in exchange for his rent. Hoffman eventually moved into a small camper, which was located in the backyard of defendant's home. In 2001, Hoffman and defendant–whom Hoffman characterized as his "brother"–began an automobile repair business, which Hoffman and defendant owned until August 2008. Hoffman explained that he would perform the majority of the mechanic work and defendant would handle the business's finances.

¶ 68 Hoffman testified that defendant owned two handguns: a .32-caliber automatic and a smaller .22- or .25-caliber gun. About two months before Dawn's death, defendant told Hoffman that his relationship with Dawn was deteriorating. Shortly thereafter, defendant spoke with Hoffman and asked him to kill Dawn because he was afraid that Dawn was going to take the children from him. After Dawn moved out of defendant's home in August 2008, Hoffman agreed to help defendant follow her to determine whether she was in another relationship. During August 2008, Hoffman stated that defendant asked him to kill Dawn "almost every day." Hoffman agreed after an exchange in which defendant threatened to cut Dawn's head off.

¶ 69 On the morning of August 24, 2008, defendant told Hoffman that he would block the driveway so that when Dawn arrived, she would have to park at the far end of the driveway–closest to the street–which would minimize the sound of the gunshot in the home.

Defendant gave Hoffman his two handguns and 200 additional rounds of ammunition. Defendant stated that he would keep the children in the house so that they would not witness the shooting. After shooting Dawn, Hoffman planned to travel on his bike to a church parking lot, where defendant had parked his S-10 Chevy truck. Hoffman would then drive the truck to Little Rock, Arkansas, and stay with a friend until defendant contacted him. In addition to other supplies, defendant provided Hoffman the title to the truck in the event Hoffman needed to sell it to cover his expenses. Hoffman explained that defendant directed him to shoot Dawn with the .32-caliber automatic handgun.

¶ 70     Shortly after noon, Hoffman saw Dawn drive up and he met her at the end of the driveway. After Dawn exited her car, Hoffman asked her for a cigarette. Dawn returned to her car, sat down behind the steering wheel, and leaned over the center console. As she did, Hoffman pointed the .32-caliber handgun at Dawn's head and fired one shot. Hoffman then rode his bicycle to the church parking lot, got into the S-10 Chevy truck, and drove to Little Rock. After unsuccessfully attempting to locate his friend in Little Rock, Hoffman (1) disposed of the guns and extra ammunition in some brush, (2) sold the truck for $250, and (3) bought a bus ticket to Lakeland, Florida, where his former fiancée lived. (The guns were never recovered.) Lakeland police later arrested Hoffman and, upon questioning him, Hoffman admitted that he shot Dawn. Hoffman initially denied defendant's involvement. He later explained that he was afraid of defendant because defendant had physically assaulted him in the past. When Hoffman was returned to Illinois, he spoke with his sister, who convinced him that he should answer police questions truthfully. Thereafter, Hoffman told police about defendant's involvement.

¶ 71     Hoffman acknowledged that he could not recall the answers he provided to numerous questions posed by Lakeland and Decatur police. Those answers (1) contradicted his aforementioned testimony and (2) did not implicate defendant in Dawn's death.

¶ 72     Jimmy Mardis testified that he, defendant, and Hoffman had been friends for the past 20 years. In 2007, Mardis witnessed numerous conversations defendant had with Hoffman over several months regarding defendant's concern that Dawn would leave him and take Crystal and Dalton with her. Mardis stated that defendant would routinely turn to Hoffman and tell him that he needed to "solve the problem" so defendant would not lose his kids. Specifically, defendant would attempt to persuade Hoffman with the following explanation:

>   "If [defendant] did something, then [Hoffman] would be on the street. And if [Hoffman] did something[, defendant] could at least take care of [Hoffman] while he was doing time."

¶ 73     Approximately four weeks prior to Dawn's death, defendant asked Mardis for his assistance in obtaining a "river gun," which Mardis explained was a "gun that's been turned in stolen and is not traceable back to [its] original owner." Mardis declined defendant's repeated requests, stating that he "didn't want to get involved in any type of felony." Mardis acknowledged that in September 2008, he told police that defendant did not mention killing Dawn. He later changed his account, explaining that he was afraid to tell the truth earlier because defendant had threatened his family.

¶ 74     The State also presented testimony from several other witnesses who testified to the

following: (1) Tulop owned a blue-green truck; (2) Dwight (Dawn's father) never called Dawn's attorney; (3) a few weeks prior to Dawn's death, defendant attempted to sell several vintage cars because he "had some bills to pay"; (4) defendant did not approach Dawn's car after the shooting or comfort Crystal, who was hysterical and distraught; (5) the cause of Dawn's death was a gunshot wound to her head that entered slightly above her left ear; (6) police recovered a .32-caliber casing from inside Dawn's vehicle; (7) a few days after Dawn's death, defendant attempted to collect on a joint life insurance policy; (8) defendant hired a person to burn the camper Hoffman resided in because defendant "did not want [the police] to tie him to anything"; (9) a computer data recovery expert confirmed that on August 19, 2008, defendant's computer accessed an employment Web site and sent a message–purportedly from Dawn–confessing her illegal drug use and expressing anger with her fellow employees; and (10) Hoffman complied with whatever defendant directed him to do.

¶ 75                                        2. *Defendant's Evidence*

¶ 76        Wendell McRoberts, Jr., testified that he had known defendant for over 35 years. On either August 10 or 17, 2008, he saw defendant, Dawn, Crystal, and Dalton driving down the road. As they drove side by side, McRoberts spoke briefly with defendant and noted that "everybody seemed to be in a real good mood." McRoberts acknowledged that he did not know that at that time, Dawn had already moved out of defendant's home.

¶ 77        Cody Hines testified that in 2009, he was incarcerated with Hoffman in the Macon County jail. During that time, Hoffman told Hines that he killed Dawn and defendant was not involved and defendant had no prior knowledge of his intent. Hines admitted that after he was released from jail, he visited defendant three times.

¶ 78        Eddie Harvey, Jr., testified that in January 2009, he was incarcerated with Hoffman in the Macon County jail for approximately one month. During that time, Hoffman informed him that although defendant was not involved with Dawn's murder, the police were pressuring him to implicate defendant.

¶ 79                      3. *Defendant's Cross-Examination of Peterson and Collins*

¶ 80        In its motion *in limine*, the State did not seek to admit statements Dawn made to others regarding passports for defendant, Dalton, or Crystal. At the hearing on the motion *in limine*, the State questioned Petersen regarding whether Dawn made statements to her about passports, which Petersen acknowledged Dawn had. At defendant's jury trial, defendant cross-examined Petersen on that subject, and she confirmed that Dawn told her she found passports for defendant, Dalton, and Crystal. In addition, although the State did not question Collins about passports at the hearing on its motion *in limine*, defendant asked Collins on cross-examination whether Dawn had made any statements to her in that regard. Collins' response was consistent with Petersen's testimony. Thereafter, the parties stipulated that if called to testify, Special Agent Eric Bowers of the Department of Homeland Security Immigration and Customs Enforcement would confirm that an investigation revealed that passports had not been issued to defendant, Dalton, or Crystal.

¶ 81                           C. The Jury's Verdict and the Trial Court's Sentence

¶ 82       On this evidence, the jury found (1) defendant guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and (2) that the State had proved that during the commission of the offense, defendant, or one for whose conduct defendant was responsible, was armed with a firearm (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2008) (text of section effective until June 1, 2009)). Following a sentencing hearing, the trial court sentenced defendant to 75 years in prison.

¶ 83       This appeal followed.


¶ 84                                          II. ANALYSIS

¶ 85       Defendant argues that the trial court abused its discretion by partially granting the State's motion *in limine*. Specifically, defendant contends that (1) the court erred by admitting numerous hearsay statements Dawn made primarily to friends, family members, and coworkers under section 115-10.2a of the Code, and (2) the court's decision to admit these hearsay statements violated his sixth amendment right to confrontation. Prior to addressing defendant's statutory and constitutional contentions, we first determine whether section 115-10.2a of the Code–the statutory provision upon which the trial court relied–applies to the facts of this case.


¶ 86                      A. The Applicability of Section 115-10.2a of the Code

¶ 87       Section 115-10.2a of the Code, entitled "Admissibility of prior statements in domestic violence prosecutions when the witness is unavailable to testify," provides, in pertinent part, as follows:

"(a) In a domestic violence prosecution, a statement, made by an individual identified in Section 201 of the Illinois Domestic Violence Act of 1986 as a person protected by that Act, that is not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule if the declarant is identified as unavailable as defined in subsection (c) and if the court determines that:

(1) the statement is offered as evidence of a material fact; and

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of this Section and the interests of justice will best be served by admission of the statement into evidence." 725 ILCS 5/115-10.2a (West 2010).

¶ 88       By its own terms, section 115.10.2a applies to a "domestic violence prosecution" in which the offered hearsay statements were made by a person protected by section 201 of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/201 (West 2010)). Section 201 of the Act provides that "any person abused by a family or household member" is a protected person. 750 ILCS 60/201(a)(i) (West 2010). Section 103(6) of the Act defines "family or household members" as "persons who share or formerly shared a common dwelling" (750

-14-

ILCS 60/103(6) (West 2010)). Further, section 103(1) of the Act defines "abuse" as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation" (750 ILCS 60/103(1) (West 2010)).

¶ 89 In this case, the evidence presented at the hearing on the State's motion *in limine*, demonstrating the physical abuse, harassment, and intimidation defendant inflicted upon Dawn, clearly showed that Dawn and defendant were "family or household members" as defined by the Act, and more important, that Dawn was a "protected person" under section 201 of the Act. However, no statutory definition exists for the term "domestic violence prosecution."

¶ 90 Despite this omission, we find persuasive the following excerpt from Professor Graham's Handbook of Illinois Evidence, which astutely predicted that the issue we now address would arise:

"[W]hat does 'in a domestic violence prosecution' actually mean? There is no crime denominated 'domestic violence,' solely a crime denominated 'domestic battery,' 720 ILCS 5/12-3.2. If the foregoing wife declarant was subsequently murdered allegedly by her husband, the intent of the statute is for it to potentially apply, yet the prosecution is for murder and not domestic violence. What was probably intended was for the statement to encompass any prosecution involving violence under circumstances making the alleged victim a person defined as protected by section 201(a) of the *** Act *** and the alleged perpetrator a person who is a family or household member." Michael H. Graham, Graham's Handbook of Illinois Evidence § 804.8, at 996 (10th ed. 2010).

¶ 91 In *People v. Chapman*, 2012 IL 111896, ¶ 21, 965 N.E.2d 1119, the supreme court recently considered whether section 115-20 of the Code permitted the trial court to admit a defendant's prior conviction for the domestic battery of his girlfriend at his trial for the first degree murder of that same person. The pertinent portions of section 115-20 provide, as follows:

"(a) Evidence of a prior conviction of a defendant for domestic battery, aggravated battery committed against a family or household member as defined in Section 112A-3, stalking, aggravated stalking, or violation of an order of protection is admissible in a later criminal prosecution for any of these types of offenses when the victim is the same person who was the victim of the previous offense that resulted in conviction of the defendant.

(b) If the defendant is accused of an offense set forth in subsection (a) or the defendant is tried or retried for any of the offenses set forth in subsection (a), evidence of the defendant's conviction for another offense or offenses set forth in subsection (a) may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant if the victim is the same person who was the victim of the previous offense that resulted in conviction of the defendant." 725 ILCS 5/115-20 (West 2006).

¶ 92 In disposing in *Chapman* of one of the defendant's arguments attacking the applicability of the statute, the supreme court noted, as follows:

"Defendant points out that '[t]here is no crime designated "aggravated battery

involving a family or household member" ' in the Code. But this fact actually supports the State's position that murder of a household member can, in the appropriate case, fit under the statutory language 'any of these types of offenses' because, if aggravated battery involving a household or family member is not an actual offense, then it follows that the legislature must have intended that the trial court have leeway to look to the facts and circumstances surrounding the incident to determine whether the prosecution at issue is for the type of offense contemplated by the statute." *Chapman*, 2012 IL 111896, ¶ 30, 965 N.E.2d 1119.

We agree with the rationale espoused by Professor Graham regarding the intent of the General Assembly in declining to define "domestic violence prosecution," and we note that his rationale is in accord with *Chapman*. Here, defendant, a "family or household member" as defined by the Act, was prosecuted for the first degree murder of Dawn, a protected person under the Act, which we conclude is a "domestic violence prosecution," as contemplated by section 115-10.2a of the Code.

¶ 93 Accordingly, we hold that, provided all other provisions of section 115-10.2a of the Code are satisfied, "domestic violence prosecution" encompasses prosecutions in which a family member inflicts abuse upon a person protected by section 201 of the Act. Clearly, a prosecution for first degree murder, as in the present case, meets that criterion. We now turn to defendant's statutory and constitutional claims.

¶ 94 B. Defendant's Statutory Claim

¶ 95 Defendant contends that the trial court erred by admitting numerous hearsay statements Dawn made primarily to friends, family members, and coworkers under section 115-10.2a of the Code. Specifically, defendant asserts that Dawn's hearsay statements to these people "lacked the requisite indicia of reliability, materiality, and necessity." We disagree.

¶ 96 1. *The Standard of Review*

¶ 97 "As a general rule, a trial court's ruling on a motion *in limine* regarding the introduction or exclusion of evidence is reviewed under an abuse of discretion standard." *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20, 966 N.E.2d 347. A trial court abuses its discretion only when its decision is arbitrary, fanciful, unreasonable, or no reasonable person would adopt the view taken by the court. *Id.* Accordingly, absent an abuse of discretion, this court will not disturb a trial court's ruling on a motion *in limine*. *Id.*

¶ 98 2. *An Analytical Approach To Determine*
*"Circumstantial Guarantees of Trustworthiness"*

¶ 99 In the trial court's written order, the court mentioned that it had considered 11 factors that we set forth above. The trial court apparently derived those factors from *People v. Smith*, 333 Ill. App. 3d 622, 635, 776 N.E.2d 781, 792 (2002), a decision of the First District Appellate Court to which the trial court referred in its written order. *Smith* described those factors as useful when analyzing the trustworthiness of proffered hearsay under section 115-10.4 of the

Code (725 ILCS 5/115-10.4 (West 2000)). The *Smith* court also cited a well-known treatise that contained additional factors useful in analyzing such statements for their trustworthiness. See Thomas A. Mauet & Warren D. Wolfson, Trial Evidence 236 (2d ed. 2001).

¶ 100    The issue in *Smith* was whether section 115-10.4 of the Code–as then written–was unconstitutional because that statute violated the confrontation clause (U.S. Const., amends. VI, XIV; see also Ill. Const. 1970, art. I, § 8). At that time, United States Supreme Court doctrine held that hearsay statements can be admitted at trial without violating the confrontation clause if those statements either (1) fall under a firmly rooted exception to the hearsay rule or (2) possess "particularized guarantees of trustworthiness." (Internal quotation marks omitted.) *Idaho v. Wright*, 497 U.S. 805, 817 (1990).

¶ 101    However, in *Crawford v. Washington*, 541 U.S. 36, 53 (2004), the Supreme Court abrogated its prior case law regarding the confrontation clause and adopted the view that (at most) the confrontation clause bars only "testimonial hearsay." In so concluding, the Supreme Court rejected the idea that hearsay could be admissible under the confrontation clause merely because it possessed "particularized guarantees of trustworthiness." (Internal quotation marks omitted.) *Crawford*, 541 U.S. at 60. Accordingly, *Smith* and similar cases no longer provide a valid basis for resolving *constitutional* issues under the confrontation clause.

¶ 102    Nonetheless, the factors set forth in *Smith* remain valid analytical tools when resolving *statutory* issues, like those present in this case. One of those *statutory* issues is whether the proffered hearsay statements are trustworthy. This issue arises because section 115-10.2a of the Code requires a court, when deciding whether a hearsay statement would be admissible under that section, to resolve (among other things) whether the statement possesses "equivalent circumstantial guarantees of trustworthiness." 725 ILCS 5/115-10.2a(a) (West 2010). When a trial court determines this issue, it may use prior case law regarding when a hearsay statement possesses "circumstantial guarantees of trustworthiness" even though that prior case law, as in *Smith*, (1) was concerned with a *constitutional* issue, not a *statutory* one, and (2) is no longer valid for resolving those *constitutional* issues.

¶ 103    Another example of a case like *Smith* is *People v. Thomas*, 313 Ill. App. 3d 998, 730 N.E.2d 618 (2000), in which this court addressed whether section 115-10.2 of the Code passed constitutional muster under the confrontation clause. In *Thomas*, this court concluded that it did and that the trial court properly admitted the hearsay statements in question. In reaching that conclusion, this court quoted from Trial Evidence, which listed multiple factors that could help trial courts as they evaluate the trustworthiness of proffered hearsay testimony. See *Thomas*, 313 Ill. App. 3d at 1006, 730 N.E.2d at 625 (quoting Thomas A. Mauet & Warren D. Wolfson, Trial Evidence 229-30 (1st ed. 1997)). Four years later, the United States Supreme Court, citing *Thomas* among many others, explicitly abrogated *Thomas* on constitutional grounds. See *Crawford*, 541 U.S. at 63-64. However, that action by the Supreme Court does not mean that the factors suggested in *Thomas* may not be used when considering the trustworthiness of proffered statements–specifically, whether those statements contain circumstantial guarantees of trustworthiness–for statutory purposes. In fact, we suggest that trial courts continue to use those factors, as well as the others we earlier mentioned that the trial court used in this case.

¶ 104    We again find support for our position in Professor Graham's treatise where it discusses the admissibility of hearsay statements under section 115-10 of the Code (725 ILCS 5/115-10 (West 2010)). See Michael H. Graham, Graham's Handbook of Illinois Evidence § 803.25, at 931 (10th ed. 2010). Section 115-10(b)(1) provides that such a statement may be admissible if the trial court, among other findings, "finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." 725 ILCS 5/115-10(b)(1) (West 2010). These provisions of section 115-10(b)(1) are essentially the same as asking the court to find, as it must under section 115-10.2a, that the proffered hearsay statements possess "circumstantial guarantees of trustworthiness." 725 ILCS 5/115-10.2a(a) (West 2010). In his treatise, Professor Graham cites *Thomas* and sets forth–in its entirety–the lengthy list of factors that this court quoted from Trial Evidence. Michael H. Graham, Graham's Handbook of Illinois Evidence § 803.25, at 941-42 (10th ed. 2010).

¶ 105                    3. *Defendant's Abuse-of-Discretion Claim*

¶ 106    The gravamen of defendant's claim that Dawn's various hearsay statements "lacked the requisite indicia of reliability, materiality, and necessity" is that all the statements the trial court admitted were unreliable. In this regard, defendant claims that (1) Dawn's hearsay statements were not spontaneous, (2) Dawn had a motive to portray defendant as an unfit parent, and (3) Dawn's claim was false that she saw passports that were issued to defendant, Dalton, and Crystal. We are unpersuaded.

¶ 107    The evidence presented at the hearing on the State's motion *in limine* showed that the majority of Dawn's statements were made within a reasonably short time before the event at issue, and, overall, were within six months of her death. In addition, we reject defendant's motive argument, given that none of Dawn's statements pertained to defendant's fitness as a parent, but instead primarily concerned his expressed intent to kill her if she did not comply with his demands to return to his home.

¶ 108    In this regard, had Dawn not been shot and instead had a custody fight arisen between her and defendant, we have trouble understanding how Dawn's statements (which are the subject of this appeal) would have helped Dawn or how they would have even been admissible. See *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 58 ("The general rule is that prior consistent statements of a witness are inadmissible for the purpose of corroborating the trial testimony of the witness, because they serve to unfairly enhance the credibility of the witness."). Assuming that Dawn testified at the custody hearing about defendant's abusive, threatening behavior, her hearsay statements to third parties about that same subject matter would constitute nothing more than inadmissible, prior consistent statements. See *People v. Brown*, 200 Ill. App. 3d 566, 579, 558 N.E.2d 309, 317 (1990) ("[T]he rule [on] inadmissibility of prior consistent statements also applies to a third party who seeks to testify concerning the witness' prior consistent statement.").

¶ 109    With regard to Dawn's claim concerning the passports, the trial court heard and considered that testimony. Even if the court believed that the evidence showed that Dawn lied about the passports, the court's decision to admit the majority of the hearsay statements

-18-

at issue can hardly be deemed so arbitrary, fanciful, or unreasonable as to warrant reversal.

¶ 110    In this case, as previously explained, the State sought to introduce numerous statements Dawn made primarily to friends, family members, and coworkers in the months preceding her death to show (1) why Dawn feared defendant and (2) defendant's motive for killing Dawn. The State's theory was that defendant had Dawn killed because she refused to return to the home she had shared with him for the past 17 years and, more important, she sought to have her children–Dalton and Crystal–move into her apartment.

¶ 111    In evaluating the reliability, materiality, and necessity of these statements, the trial court–in its written order–noted that it had considered the entirety of the evidence presented within the framework of 11 applicable factors. The court then found that the statements at issue were reliable, material, and necessary. The court thereafter granted the admission of a majority of the statements the State sought to introduce, concluding that the interests of justice would be best served by their admission. Defendant's arguments would have this court reweigh that evidence and reverse the trial court's determination. However, when we consider the trial court's ruling in the light of our deferential standard of review, we conclude the trial court was well within its discretion to rule as it did.

¶ 112    In so concluding, we commend (1) the State for the detailed manner in which it presented the specific statements it sought to introduce at trial, and (2) the trial court for its thoughtful and comprehensive written order, which we found very helpful.


¶ 113                      C. Defendant's Constitutional Claim

¶ 114    Defendant next contends that the trial court's decision to admit numerous hearsay statements Dawn made primarily to friends, family members, and coworkers violated his sixth amendment right to confrontation. Because we conclude that the confrontation clause is not implicated under the facts of this case, we disagree.


¶ 115              1. *Testimonial Hearsay Under Crawford and Its Progeny*

¶ 116    At the trial in *Crawford*, the State played for the jury a recording of the police questioning the defendant's wife, Sylvia, that was detrimental to the defendant's claim that he acted in self-defense when he stabbed the victim. Sylvia did not testify. *Crawford*, 541 U.S. at 40. Thus, the issue before the Supreme Court was whether the admission of the recording violated the defendant's sixth amendment right to confrontation. (The sixth amendment right to confrontation provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI.) In concluding that it did, the Supreme Court noted that by its own terms, the focus of the confrontation clause is on " 'witnesses' against the accused–in other words, those who 'bear testimony.' " *Crawford*, 541 U.S. at 51. The Court then defined the type of testimony the confrontation clause was designed to address, as follows:

    " 'Testimony' *** is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a

formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement." *Id*.

¶ 117    The Supreme Court labeled such solemn declarations as *testimonial* statements (*Crawford*, 541 U.S. at 51) but declined to provide a comprehensive definition of that term (*Crawford*, 541 U.S. at 68). In this regard, the Supreme Court held that, at a minimum, "testimonial" encompasses "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," which it concluded were the "modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id*. Thus, *Crawford* holds that "testimonial hearsay" (a term of art that previously had not existed) is a "specific type of out-of-court statement" (*Crawford*, 541 U.S. at 51) that implicates the confrontation clause because it is "hearsay [that] consists of *ex parte* testimony" (*Crawford*, 541 U.S. at 60).

¶ 118    The *Crawford* Court then noted the following about testimonial hearsay:

"[T]he principal evil at which the [c]onfrontation [c]lause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. \*\*\*

        \*\*\*

This focus \*\*\* suggests that not all hearsay implicates the [s]ixth [a]mendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the [c]onfrontation [c]lause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them." *Crawford*, 541 U.S. at 50-51.

¶ 119    In *Davis v. Washington*, 547 U.S. 813, 826 (2006), the Supreme Court considered whether statements the victim, Michelle, made in response to a 9-1-1 operator's questions–in other words, in response to a government official's questions–during an ongoing emergency were testimonial, thus implicating the confrontation clause. The Court, noting its prior pronouncement in *Crawford* that defined testimony as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" (internal quotation marks omitted) (*Crawford*, 541 U.S. at 51), differentiated the statements made by Sylvia in *Crawford* from those made by Michelle, as follows: (1) Sylvia was describing past events, while Michelle was describing ongoing events; (2) an objective listener would realize Michelle, unlike Sylvia, was facing an ongoing emergency; (3) the nature of the questions revealed the operator was attempting to garner information from Michelle to resolve the present emergency instead of learning what had occurred in the past, as with Sylvia; and (4) Michelle was responding in a frantic tone while Sylvia remained calm when responding. *Davis*, 547 U.S. at 827.

¶ 120    In concluding that the circumstances of Michelle's "interrogation" objectively indicated that its primary purpose was to enable police to address an ongoing emergency, the Court noted that Michelle was "not acting as a *witness*; she was not *testifying*." (Emphases in

original.) *Davis*, 547 U.S. at 828.

¶ 121     2. *The Requirement of Government Involvement for*
         *a Statement To Constitute Testimonial Hearsay*

¶ 122     Defendant acknowledges the Supreme Court's holding in *Crawford,* but nonetheless claims that "Dawn was intent on bearing witness" against him. In support of his claim, defendant posits that (1) Dawn and he were involved in a custody dispute, (2) he had filed a petition for a determination of parental rights, and (3) Dawn intended to file a petition for an order of protection. Thus, defendant asserts that it is "clear [that] Dawn intended that the State would make use of her statements at trial in the event of her death."

¶ 123     The primary problem with defendant's argument is that it overlooks the fact that none of Dawn's statements were made to government officials. Thus, as legal scholars have explained, those statements do not constitute testimonial hearsay. In his treatise, Professor Graham addresses the "testimonial" versus "nontestimonial" distinction set forth in *Crawford* and *Davis,* and writes as follows:

"Very importantly, notice that even though *Davis* like *Crawford* before it explicitly declined to present a comprehensive definition of 'testimonial,' *Davis* nevertheless clearly supports the proposition that *all other statements* [(emphasis in original)], i.e., statements where the primary purpose for which the statement is employed at the time made does not relate to prosecuting a past criminal event, even when made pursuant to a government official, are not 'testimonial.' *** *All statements made to someone other than a government official are always 'nontestimonial'* [(emphasis added)]; unavailability of the declarant for cross-examination does not preclude admissibility against the criminal defendant." Michael H. Graham, Graham's Handbook of Illinois Evidence § 807.1, at 1013 (10th ed. 2010).

Indeed, Professor Graham was so adamant about this subject that he concluded his lengthy analysis regarding testimonial hearsay with the following sentence–the only such one we know of in Professor Graham's 1,273-page treatise–set forth all in emphases: "*The sooner Illinois law conforms to the universally held view that statements to nongovernmental officials are never testimonial[,] the better.*" (Emphasis in original.) Michael H. Graham, Graham's Handbook of Illinois Evidence § 807.3, at 1032 (10th ed. 2010).

¶ 124     In another of Professor Graham's treatises, the seven-volume Michael H. Graham, Handbook of Federal Evidence (7th ed. 2012), Professor Graham addresses the same issue and writes as follows: "*Davis* does clarify that the confrontation clause focuses solely upon conduct by government officials." Michael H. Graham, Handbook of Federal Evidence § 802:2.1, at 735 (7th ed. 2012).

¶ 125     We find further support for the need for government involvement before a statement can be deemed testimonial hearsay in the following:

"In both *Crawford* and *Davis*, the Court made clear that the Confrontation Clause is aimed at a particular practice: the trial use of formalized, ex parte statements to government officials investigating an offense.

The *Crawford* Court explains at length that it is *governmental involvement* in that statement which bears the 'closest kinship to the abuses at which the Confrontation Clause was directed.' Without governmental involvement, the concerns animating the Confrontation Clause are largely absent." (Emphasis in original.) Daniel B. Shanes, *The Crawford Confrontation Clause: Governmental Involvement is Key to Testimonial Hearsay*, 96 Ill. B.J. 574, 576 (2008).

¶ 126   In *Giles v. California*, 554 U.S. 353 (2008), the United States Supreme Court discussed the necessity of government involvement before a statement can constitute testimonial hearsay. In *Giles*, the trial court allowed prosecutors to introduce statements that the murder victim had made to a police officer responding to a domestic-violence call. The California Supreme Court concluded that this evidence did not violate the confrontation clause under the doctrine of forfeiture by wrongdoing. That is, it concluded that the defendant had forfeited his right to confront the victim's testimony because the defendant had committed the murder for which he was on trial–an intentional criminal act that made the victim unavailable to testify. *Giles*, 554 U.S. at 357. In the course of considering whether the California courts correctly applied the forfeiture-by-wrongdoing rule, the Supreme Court had occasion to address *Crawford* and *Davis* and discuss once again what constitutes testimonial hearsay: "[O]nly *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules ***." (Emphasis in original.) *Giles*, 554 U.S. at 376.

¶ 127   Judge Shanes's article, *The Crawford Confrontation Clause*, concludes as follows:

"For the moment, the full scope of what testimonial hearsay encompasses remains uncertain. What is clear, however, is that *Crawford* teaches government involvement is typically a key component of testimonial hearsay. 'An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'

In *Giles*, the Supreme Court echoes that teaching. A person simply does not *testify* to grandparents, friends, doctors, or others. Testimony, as that term is understood by *Crawford*, requires a formality and purpose attendant to sworn or courtroom proceedings or statements made to police investigating a crime.

Absent governmental involvement in the production of an out-of-court statement, courts should pause long and hard before deeming it testimonial hearsay." (Emphasis in original.) Shanes, *supra*, at 578.

¶ 128   In quoting Professor Graham at length, we note the status that Professor Graham and his Handbook of Illinois Evidence have earned in the eyes of the Illinois judiciary in general and the Supreme Court of Illinois in particular. For instance, over the last 20 years, our supreme court has cited various editions of Graham's Handbook of Illinois Evidence in 63 separate cases, and we are not aware of any instance in which the court rejected his analysis.

¶ 129   Further, in November 2008, the Illinois Supreme Court created a special committee on Illinois evidence and charged it with codifying the law of evidence in this state. As Professor Graham explains in the preface to the 10th edition of his treatise, he was appointed by the

court as advisor to the new committee. In that role, he "prepared, pursuant to the Chair's direction, suggested draft rules, sometimes in the alternative, to be included in the Illinois Rules of Evidence." (Michael H. Graham, Graham's Handbook of Illinois Evidence, at xiii (10th ed. 2010).) Ultimately, the committee finished its work and presented the supreme court with its final proposed rules. In September 2010, the Illinois Supreme Court adopted the proposal as the new Illinois Rules of Evidence.

¶ 130    In addition, Professor Graham is also a renowned evidence expert nationwide because of his authorship of the Handbook of Federal Evidence (7th ed. 2012), which exhaustively covers (in seven separate volumes) the analysis and application of the Federal Rules of Evidence. Given Professor Graham's national renown, we are fortunate in Illinois to have him continue to author the Handbook of Illinois Evidence.

¶ 131    Accordingly, when we stated that we give great weight to the unusually strong recommendation of Professor Graham regarding the need for government involvement in order for a statement to be deemed testimonial hearsay, we did so advisedly. To paraphrase a famous television commercial, when Professor Graham speaks about Illinois evidence law, the courts listen. We conclude that this court should follow Professor Graham's counsel regarding testimonial hearsay, and we believe that a majority of the Supreme Court of Illinois would be similarly so persuaded when it next has occasion to consider this issue.

¶ 132                     3. *The Analysis of Other Legal Scholars*

¶ 133    We have also considered other legal scholars who support that same conclusion, as follows:

> "[G]overnment involvement in the creation of the out-of-court statement is a prerequisite to determining that the statement is testimonial. This would categorically eliminate statements made to individuals who are not government officials or agents involved in the prosecution or investigation of the criminal case. Thus, statements made to private parties not acting on behalf of government officials involved in the prosecution or investigation of criminal cases would never be testimonial within the meaning of Crawford." Carol A. Chase, *Is Crawford a "Get Out of Jail Free" Card for Batterers and Abusers? An Argument for a Narrow Definition of "Testimonial"*, 84 Or. L. Rev. 1093, 1120 (2005).

¶ 134    An article in the Georgetown Law Journal takes a similar position:

> "When there is no clear government involvement, either in the active of elicitation or passive reception of accusatory hearsay, the [c]onfronation [c]lause and its rationale as set out by Justice Scalia are not implicated. Under those circumstances, *** the Court should explicitly establish a bright-line rule against finding such hearsay testimonial." Ariana J. Torchin, Note, *A Multidimensional Framework for the Analysis of Testimonial Hearsay Under Crawford v. Washington*, 94 Geo. L.J. 581, 610 (2006).

The Georgetown article further notes that statements *casually* made to friends, family, and acquaintances have consistently been found nontestimonial, even if incriminating. The article points out that such statements are typically made to convey information to accomplish other purposes, or for no real purpose other than to share the burden of an emotional event. *Id.* We

deem this last observation particularly appropriate to the specific facts of this case.

¶ 135     Based upon all of the foregoing, we conclude that absent government involvement in eliciting or receiving an accusatory hearsay statement, that statement does not constitute testimonial hearsay.

¶ 136                              4. *Case Law From Other Jurisdictions*

¶ 137     Since the Supreme Court first explained the concept of testimonial hearsay eight years ago, courts nationwide have struggled to understand *Crawford* and its progeny and to properly apply them. Case law from these other jurisdictions has helped inform us in this case.

¶ 138     Some courts have categorically held that statements between private parties are not testimonial. See *State v. Calhoun*, 657 S.E.2d 424, 427 (N.C. Ct. App. 2008) (victim's statement in murder case did not constitute testimonial hearsay because it was not made to a police officer); *Garcia v. State*, 246 S.W.3d 121, 133 (Tex. Ct. App. 2007) (victim's statements to third parties that she was afraid of the defendant did not constitute testimonial hearsay because they were not "given in response to police interrogations," but instead were made to the victim's coworkers, friends, and her divorce attorney); *Jensen v. Pliler*, 439 F.3d 1086, 1089 (9th Cir. 2006) (attorney permitted to testify to statements made to him by his client (who was incarcerated) that incriminated the defendant, even though the client was subsequently killed; Ninth Circuit held that client's statements did not constitute testimonial hearsay because they "were not made to a government officer with an eye toward trial, the primary abuse at which the [c]onfrontation [c]lause was directed"); *Hughes v. State*, 815 N.W.2d 602, 608 (Minn. 2012) (Minnesota Supreme Court deems *Jensen* and *Garcia* "well-reasoned and persuasive" and concludes that in this murder trial the victim's statements to her divorce lawyer about various problems with the defendant trying to control and intimidate her did not constitute testimonial hearsay because they were not made to law enforcement personnel); *State v. Ladner*, 644 S.E.2d 684, 689 (S.C. 2007) (statement of child sex victim to caregiver about the defendant's conduct "clearly nontestimonial" because the victim's statement was "much more akin to a remark to an acquaintance rather than a formal statement to government officers"; court added that simply because parents turn over information about crimes to law enforcement authorities does not transform their interactions with their children into police investigations); *People v. Vigil*, 127 P.3d 916, 928 (Colo. 2006) (*en banc*) (statements made by victim in a child sex offense case to his father and father's friend did not constitute testimonial hearsay because they were not made during police interrogation nor were government officials involved when the victim made the statements); *Hobgood v. State*, 2004-KA-01917-SCT (¶¶ 11-14) (Miss. 2006) (child sex abuse victim's statements to mother, grandmother, babysitter, and doctors regarding the defendant's sexual abuse did not constitute testimonial hearsay because they were not given to police or individuals working with police); *People v. Cage*, 155 P.3d 205, 219-20 (Cal. 2007) (because the focus of both *Crawford* and *Davis* is on formal and solemn accusatory statements made to *law enforcement agents* in the context of *criminal investigations or inquiries*, statement made solely for purposes of medical treatment to a physician not

affiliated with police or prosecutors does not constitute testimonial hearsay; the "mere fact that doctors must report abuse they *see, suspect, or know of* in the course of practice does not transform them into *investigative agents* of law enforcement" (emphases in original)); *State v. Brocca*, 979 So. 2d 430, 434 (Fla. Dist. Ct. App. 2008) (statements sexual assault victim made to his mother were nontestimonial because they "were not made to a government agent or under police interrogation"); *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011) (statements made to police in the course of official investigation are testimonial; statements made to friends and acquaintances are nontestimonial); *State v. Miller*, 896 A.2d 844, 859 (Conn. App. Ct. 2006) ("[t]he courts of this land, both federal and state, are in agreement that statements made to friends in unofficial settings do not constitute testimonial hearsay"); *Laine v. State*, 786 N.W.2d 635, 639 (Minn. 2010) (trial court properly admitted victim's out-of-court statements to show the defendant's prior acts of domestic abuse in murder trial; statements were nontestimonial because they were made to friends and coworkers, not law enforcement officers).

¶ 139    Admittedly, many more decisions dealing with the requirement of government involvement exist beyond those discussed above, but, for the most part, those decisions merely indicate uncertainty about the issue. A good example is *State v. Franklin*, 308 S.W.3d 799, 816 (Tenn. 2010), in which the Tennessee Supreme Court wrote the following:

> "Based on the language from *Crawford* and *Davis*, some courts have categorically held that statements between private parties–or, at least, specific types of such statements–are not testimonial. Today, however, we do not hold that statements between private parties unconnected to law enforcement, such as the exchange between the victim and the [witness] in this case, are per se nontestimonial and thus exempt from [c]onfrontation [c]lause scrutiny. The United States Supreme Court has not expressly decided this issue, and, much like that Court, we will continue to define which statements are 'testimonial' only to the extent necessary to resolve the cases before us."

¶ 140    For the following reasons, we respectfully disagree with this approach. First, we believe that the rule we adopt here–namely, that government involvement is required for a statement to be deemed testimonial hearsay–is the better-reasoned rule (as explained by the above cases and–particularly–Professor Graham) and is more consistent with *Davis, Crawford,* and *Giles*. Second, clarification and guidance are needed now by the trial courts of Illinois, who must deal with these complex and difficult evidentiary issues in pending, serious cases. The failure to provide that guidance does a disservice to the trial bench and bar. And third, we cannot hold the rules of evidence in abeyance until such time–if ever–the United States Supreme Court chooses to again address this issue to provide clarification. As of this writing, that Court has no case on its docket that would provide a vehicle for such clarification, and we cannot predict when and if the United States Supreme Court will choose to accept a particular case or to address a certain issue.

¶ 141                    5. *The Need for "Government Involvement"*
                          *To Include the "Conduit Theory"*

¶ 142    The Georgetown Law Journal article we cited earlier provides some interesting analysis

-25-

because while it "maintains that government involvement is crucial to finding a statement testimonial," it adds that "a superficial application of this argument risks crippling the constitutional rights of the accused." Torchin, *supra*, at 612. The article then explains this concern as follows:

> "Under what Professor Mosteller has called the 'conduit theory,' statements created by the declarant-witness for prosecutorial or investigative use against the accused transmitted indirectly to the authorities are still essentially testimonial and should be treated as such. *** The relevant inquiry in such instances is not whether a reasonable person would have anticipated the ultimate path of the statement, but rather how direct or attenuated the relationship was between the conduit's motivation to transmit the statement to law enforcement agents and the intent of the accusing declarant-witness." *Id*.

¶ 143    For an understanding of this conduit theory in a real case, we need look no further than the decision of the Wisconsin Supreme Court in *State v. Jensen*, 2007 WI 26, 299 Wis. 2d 267, 727 N.W.2d 518 (Wis. 2007), even though that court did not use the term "conduit." In *Jensen*, the defendant was convicted of killing his wife, Julie. On appeal, the court addressed the admissibility of (1) a letter Julie wrote to the police, (2) a voicemail message and other statements Julie made to police officer Ron Kosman, (3) statements Julie made to a neighbor, and (4) statements Julie made to her son's teacher. At trial, the neighbor testified that just prior to her death, Julie gave him an envelope and told him that if anything happened to her, he should give the envelope to the police. Julie also told him that she was upset and scared, and she feared that the defendant was trying to poison her or inject her with something because he was trying to get her to drink wine and she found syringes in a drawer. Additionally, Julie told him that she did not think she would make it through one particular weekend because she had found suspicious notes written by her husband and computer pages about poisoning. *Id.* ¶ 5.

¶ 144    On the day after Julie's death, the neighbor gave the sealed envelope that he had received from her to the police. It contained a handwritten letter that a document examiner concluded was written by Julie, addressed to "Pleasant Prairie Police Department, Ron Kosman or Detective Ratzenburg," and it bore Julie's signature. The letter conveyed in detail Julie's suspicions and concerns about her husband, explained that because of her children she would never commit suicide, and described how she did not drink and did not use much in the way of medication. *Id.* ¶ 7.

¶ 145    Kosman testified that he received two voicemails from Julie approximately two weeks prior to her death. In the second, she said she thought the defendant was trying to kill her, and she asked him to call her back. He did and subsequently went to her home to talk with her. She told him that she saw strange writings on the defendant's day planner, and she said that the defendant was looking at strange material on the Internet. She told Kosman that if she were found dead, she did not commit suicide, and the defendant should be the first suspect. *Id.* ¶ 6.

¶ 146    Two weeks before Julie died, the teacher had a conversation with Julie in which she said she was afraid her husband was going to kill her. Julie explained to the teacher in some detail

why she believed that. Id. ¶ 9 n.3.

¶ 147    Before the Wisconsin Supreme Court, the State argued, in part, that government involvement in creating a statement is an indispensable feature of testimonial hearsay. The Wisconsin Supreme Court disagreed, explaining that "such a narrow definition of testimonial could create situations where a declarant could nefariously incriminate a defendant." *Id.* ¶ 24. The court added the following analysis:

> "[W]e conclude that under the circumstances, a reasonable person in Julie's position would anticipate a letter addressed to the police and accusing another of murder would be available for use at a later trial. The content and the circumstances surrounding the letter make it very clear that Julie intended the letter to be used to further investigate or aid in prosecution in the event of her death. Rather than being addressed to a casual acquaintance or friend, the letter was purposely directed toward law enforcement agents. The letter also describes Jensen's alleged activities and conduct in a way that clearly implicates Jensen if 'anything happens' to her.
>
> ***
>
> Perhaps most tellingly, Julie's letter also resembles Lord Cobham's letter implicating Sir Walter Raleigh of treason as discussed in *Crawford*, 541 U.S. at 44, 124 S. Ct. 1354. At Raleigh's trial, a prior examination and letter of Cobham implicating Raleigh in treason were read to the jury. *** While Julie's letter is not of a formal nature as Cobham's letter was, it still is testimonial in nature as it clearly implicates Jensen in her murder. If we were to conclude that her letter was nontestimonial, we would be allowing accusers the right to make statements clearly intended for prosecutorial purposes without ever having to worry about being cross-examined or confronted by the accused. We firmly believe *Crawford* and the [c]onfrontation [c]lause do not support such a result.
>
> ***
>
> Finally, we consider the statements Julie made to [the neighbor] and [the teacher]. *** While we reiterate that governmental involvement is not a necessary condition for testimonial statements, we conclude that under the circumstances of this case, Julie's statements to [the neighbor] and [the teacher] were nontestimonial. Essentially, we are not convinced that statements to a neighbor and a child's teacher, unlike the letter and voicemails—which were directly intended for the police—were made under circumstances which would lead a reasonable person in the declarant's position to conclude these statements would be available for later use at trial.
>
> * * *
>
> In sum, under *Crawford*, we conclude that Julie's letter and voicemail messages are testimonial, while her statements to [the neighbor] and [the teacher] are nontestimonial." *Id.* ¶¶ 27-34.

¶ 148    Although we share the concerns of the Wisconsin Supreme Court regarding Julie's letter to the police and we agree that the letter constituted testimonial hearsay, we do not agree that these holdings require the further conclusion, as reached by that court, "that governmental involvement is not a necessary condition for testimonial statements." *Id.* ¶ 31. Instead, we conclude a more appropriate approach would be to apply the "conduit theory," as discussed

in the Georgetown Law Journal article. That is, although Julie's letter was in fact given to her neighbor, the neighbor was merely a conduit for conveying Julie's statements to the police in the clear hope that, if she is found dead, the police will perhaps use the information in the letter to investigate and prosecute her husband. When so viewed, Julie's letter can be correctly seen as a communication by her to the police, which certainly would satisfy the requirement of government involvement before a hearsay statement can be deemed testimonial hearsay.

¶ 149    In the case before us, although Dawn feared for her life at the hands of defendant, she engaged in none of the conduct that Julie (the victim in *Jensen*) did, so as to make Julie's neighbor (to whom she gave a letter to be delivered to the police in the event of her death) merely a *conduit* of the statements ultimately delivered to the police.

¶ 150                    6. *Government Involvement May Be a Question*
                        *of Fact for Resolution by the Trial Court*

¶ 151    We earlier noted that government involvement is required for a statement to constitute testimonial hearsay. However, in a given case, both the existence and extent of government involvement may not be clear. Thus, making these determinations may require fact-finding by the trial court. And such fact finding may also be required to determine whether the "conduit theory" applies.

¶ 152    For instance, at issue in *Hernadez v. State*, 946 So. 2d 1270, 1271 (Fla. Dist. Ct. App. 2007), was the admissibility of statements the young victim of an alleged sexual battery and her parents made to a nurse who was a member of the local " 'Child Protection Team.' " When the child and her parents did not testify at trial, the issue on appeal was whether their statements to the nurse constituted testimonial hearsay and should have been excluded. The appellate court concluded that the nurse was acting in concert with law enforcement in questioning the child and her parents to gather information for a potential criminal prosecution. Accordingly, the court reversed the conviction and remanded for a new trial. *Id.* at 1271.

¶ 153    In reaching this conclusion, the *Hernadez* court addressed authority the State cited in support of its claim that the statements were not testimonial hearsay. In doing so, it distinguished *Foley v. State*, 2004-KA-00070-SCT (¶ 10) (Miss. 2005) (holding that a child's statements about sexual abuse to various medical professionals were nontestimonial where no evidence showed that the medical professionals had contacted the police or were acting in concert with them to interrogate the child or investigate her claims), and *State v. Moses*, 119 P.3d 906, 912 (Wash. Ct. App. 2005) (wife's statements to emergency room physician about an attack by her husband were nontestimonial because the physician had no role in the investigation and was not working with the police to develop testimony for prosecution). The *Hernandez* court concluded that the facts before it demonstrated substantial and official police involvement in the production of the statements and the deliberate purpose to gather information for a potential criminal prosecution. The court added that "[t]hese are hallmarks of testimonial statements." *Hernandez*, 946 So. 2d at 1284. We believe that these cases correctly stand for the proposition that when either the existence or the extent of government

-28-

involvement is not clear, the trial court should receive pertinent evidence and make appropriate findings of fact.

¶ 154    In the present case, however, we need not further address any government involvement in the making or receiving of Dawn's various hearsay statements. The record before us reveals no such involvement at all.

¶ 155    *7. Dawn's Hearsay Statements Were Not Testimonial Hearsay*

¶ 156    Adhering to the Supreme Court's guidance in *Crawford* and *Davis*, we reject defendant's contention that the admission of Dawn's numerous hearsay statements violated his sixth amendment right to confrontation. Here, the evidence showed that the statements regarding defendant's threats to kill Dawn were made (1) in response to questions primarily by friends, family members, and coworkers who inquired of Dawn for various reasons or (2) were volunteered by Dawn to that same audience, undoubtedly for a host of reasons that had nothing to do with ensuring defendant was incarcerated but, instead, everything to do with her concern that defendant might kill her. We need not, however, speculate as to the reasons for the questions put to Dawn or Dawn's willingness to make the statements at issue. Simply put, according to United States Supreme Court doctrine, Dawn's statements at issue in this case did not constitute testimonial hearsay because there was no government involvement in eliciting or receiving them.

¶ 157    *8. The Stechly Plurality*

¶ 158    In so concluding, we acknowledge that five years ago, a plurality of the Supreme Court of Illinois discussed the need for government involvement in testimonial hearsay. In *People v. Stechly*, 225 Ill. 2d 246, 870 N.E.2d 333 (2007), the plurality noted that the United States Supreme Court had not–at that time–had occasion to apply the confrontation clause to statements other than those made in response to police interrogation; the *Stechly* plurality further observed that the Court "left open the questions not only 'when' but '*whether*' statements made to persons other than law enforcement personnel are 'testimonial.' " (Emphasis in original.) *Stechly*, 225 Ill. 2d at 285, 870 N.E.2d at 357 (quoting *Davis*, 547 U.S. at 823 n.2). In *Stechly*, the State had argued that only statements made to law enforcement personnel can be testimonial. The *Stechly* plurality declined to adopt that position, pointing out that while there is language in *Crawford* emphasizing the role of government officers in creating testimonial hearsay, *Crawford* itself imposed no such *per se* rule. *Stechly*, 225 Ill. 2d at 286, 870 N.E.2d at 357.

¶ 159    A majority of the Supreme Court of Illinois in *Stechly* did not support the position of the *Stechly* plurality. Justice Kilbride concurred in part and dissented in part, explaining that "the plurality's analysis of both the section 115-10 issue and the confrontation clause claim is faulty." *Id.* at 317, 870 N.E.2d at 374 (Kilbride, J., concurring in part and dissenting in part). However, because he agreed "with the plurality's ultimate holding on the confrontation clause claim that the defendant's convictions must be reversed and the cause remanded for a hearing on forfeiture by wrongdoing," he concurred in the judgment. *Id.* at 317, 870 N.E.2d at 374 (Kilbride, J., concurring in part and dissenting in part).

¶ 160    Then-Chief Justice Thomas dissented on the ground that reversal was not required on the particular facts of the case because improperly admitting certain statements constituted harmless error. In reaching that decision, he agreed with the plurality that the child sex victim's hearsay statements to her mother constituted nontestimonial hearsay under *Crawford* and that the child's other two statements at issue (one to a child abuse nurse at the hospital to which the child was brought, and another to a school social worker who later interviewed the child) both constituted testimonial hearsay and were improperly admitted. *Id.* at 330-31, 870 N.E.2d at 382 (Thomas, C.J., dissenting, joined by Karmeier, J.).

¶ 161    Justices Garman and Karmeier joined in Chief Justice Thomas' dissent, and neither the three dissenters nor Justice Kilbride addressed in any way the plurality's discussion of whether only statements made to law enforcement personnel can be testimonial hearsay.

¶ 162    We further note that under the facts of *Stechly*, the plurality's discussion on this issue was dicta because it was not necessary for a resolution of the issue before the court. That is, the *Stechly* plurality concluded that the nurse and social worker were acting essentially as " 'agents of law enforcement' " at the time they spoke with the victim, so that their acts may be said to be " 'acts of the police.' " *Id.* at 300, 870 N.E.2d at 365 (majority op.). Thus, in support of its conclusion that the statements constituted testimonial hearsay, the *Stechly* plurality noted that the interviews the nurse and social worker conducted "appear to have been for the sole purpose of gathering information in order to pass it along to the authorities." *Id.* at 300, 870 N.E.2d at 365.

¶ 163    In the last five years, the Supreme Court of Illinois has referred to *Stechly*, but the issue of whether statements made to nongovernment officials can ever constitute testimonial statements under *Crawford* was not present in the cases in which those references occurred. See *People v. Sutton*, 233 Ill. 2d 89, 908 N.E.2d 50 (2009); *In re Rolandis G.*, 232 Ill. 2d 13, 902 N.E.2d 600 (2008). In *Sutton*, the court did refer to how the *Stechly* plurality concluded that if the statements at issue were not the product of law enforcement interrogation, the proper focus is on the intent of the declarant and the inquiry should be whether the objective circumstances would lead a reasonable person to conclude that the statements could be used against the defendant. *Sutton*, 233 Ill. 2d at 111, 908 N.E.2d at 64. However, none of that was at issue in *Sutton* because all of the statements in question were made to law enforcement personnel.

¶ 164    The only Illinois case citing the *Stechly* plurality's holding that a statement may be testimonial even if not made to law enforcement personnel is the Third District's decision in *People v. Belknap*, 396 Ill. App. 3d 183, 209, 918 N.E.2d 1233, 1256 (2009). And even in *Belknap*, the court did not need to rely upon the *Stechly* plurality to reach its decision because the court concluded that the statements at issue in that case were not testimonial. Those statements were made by the mother of the child victim in that first degree murder case in which the defendant, the mother's boyfriend who was living with the mother and victim, was charged with beating the child to death. The statements were made by the mother to a paramedic at the hospital to which the child was taken for treatment. The paramedic asked the mother, " 'Did he hurt her?' " to which the mother replied, in part, " 'I will never trust her with him again.' " *Id.* at 192, 918 N.E.2d at 1243. The appellate court concluded that the mother's statements to the paramedic were not testimonial because the paramedic

-30-

was providing care for the child and a reasonable person in the mother's circumstances would not have believed that her statements could be used in a criminal prosecution against the defendant. *Id.* at 209, 918 N.E.2d at 1256. Thus, the court in *Belknap* did not need to decide whether a statement could be testimonial absent government involvement in eliciting or receiving that statement.

¶ 165    Importantly, the Illinois Supreme Court decided *Stechly* before the United States Supreme Court issued its opinion in *Giles*. In addition, the *Belknap* court similarly did not consider *Giles*.

¶ 166                                    III. CONCLUSION

¶ 167    For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 168    Affirmed.

¶ 169    JUSTICE POPE, specially concurring.

¶ 170    I agree with the majority's analysis of the applicability of section 115-10.2a of the Code. *Supra* ¶¶ 86-93. I also agree Dawn's statements were not testimonial and therefore their admission did not violate the confrontation clause as interpreted in *Crawford*. I conclude a reasonable person in Dawn's position would not have anticipated her statements likely would be used in prosecuting the defendant, and thus in accordance with *People v. Stechly*, 225 Ill. 2d 246, 292, 870 N.E.2d 333, 361 (2007), her statements would be admissible under *Crawford*. Last, I find paragraphs 128 to 131, *supra*, unnecessary to our decision in this case and consequently do not join in that part of the opinion.