THE STATE OF OHIO, APPELLANT, *v.* CLARK, APPELLEE.

[Cite as *State v. Clark,* 137 Ohio St.3d 346, 2013-Ohio-4731.]

*Criminal law—Confrontation Clause—R.C. 2151.421—A teacher acts in a dual capacity as an instructor and as an agent of the state for law-enforcement purposes when questioning a child about suspected abuse in furtherance of the teacher's duty to report abuse—Statements elicited from a child by a teacher in the absence of an ongoing emergency and for the primary purpose of gathering information of past criminal conduct and identifying the alleged perpetrator of suspected child abuse are testimonial.*

(No. 2012-0215—Submitted January 23, 2013—Decided October 30, 2013.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 96207, 2011-Ohio-6623.

_____

SYLLABUS OF THE COURT

1. At a minimum, when questioning a child about suspected abuse in furtherance of a duty pursuant to R.C. 2151.421, a teacher acts in a dual capacity as both an instructor and as an agent of the state for law-enforcement purposes.

2. Statements elicited from a child by a teacher in the absence of an ongoing emergency and for the primary purpose of gathering information of past criminal conduct and identifying the alleged perpetrator of suspected child abuse are testimonial in nature in accordance with *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and *State v. Siler,* 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534.

_____

**O'DONNELL, J**.

**{¶ 1}** The issue in this case is whether the trial court violated Darius Clark's constitutional right to confront the witnesses against him when it admitted a hearsay statement that three-and-a-half-year-old L.P. made to his preschool teacher, Debra Jones, in response to questions asked about injuries to his eye and marks on his face observed upon his arrival at a preschool day care.

**{¶ 2}** In *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the court enunciated the primary-purpose test to determine whether a statement made to a law-enforcement officer or an agent of law enforcement in the course of an investigation is testimonial or nontestimonial.

**{¶ 3}** We adopted that test in *State v. Siler*, holding:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, paragraph one of the syllabus, quoting *Davis* at 822.

**{¶ 4}** At the time Jones questioned L.P., she acted as an agent of the state for purposes of law enforcement because at a minimum, teachers act in at least a dual capacity, fulfilling their obligations both as instructors and also as state agents to report suspected child abuse pursuant to R.C. 2151.421, which exposes them to liability if they fail to fulfill this mandatory duty. Because the circumstances objectively indicate that no ongoing emergency existed and that the

2

primary purpose of the questioning was to establish or prove past events potentially relevant to a later prosecution, the statement L.P. made to his preschool teacher is testimonial in nature, and its admission into evidence violated Clark's right to confront witnesses under the Sixth Amendment to the United States Constitution.

{¶ 5} Accordingly, we affirm the judgment of the court of appeals.

### Factual and Procedural History

{¶ 6} Darius Clark lived with his girlfriend, T.T., her three-year-old son, L.P., and her two-year-old daughter, A.T. On March 17, 2010, Clark dropped off L.P. at the William Patrick Day Head Start Center in Cleveland. While in the center's lunchroom, one of L.P.'s preschool teachers, Ramona Whitley, observed that L.P.'s left eye appeared bloodshot and bloodstained. She asked him, "What happened?" and L.P. at first said nothing but then replied, "I fell." Whitley asked, "How did you fall and hurt your face?" and L.P. answered, "I fell down."

{¶ 7} On arriving in the brighter light of the classroom, Whitley looked again at L.P. and saw "[r]ed marks, like whips of some sort" on L.P.'s face. Whitley, "in shock," got the attention of the class's lead teacher, Debra Jones.

{¶ 8} When Jones saw L.P.'s eye, she said, "He needs to go to Ms. Cooper, my supervisor. After I looked at him, I said, you know, I'm going to take him to Ms. Cooper." Jones then asked, "Who did this? What happened to you?" L.P. "seemed kind of bewildered. He said something like Dee, Dee." Jones described L.P. as "Out. Staring out. And I was asking him—he almost looked uncertain, but he said, Dee." Because L.P. had only attended the school for a short time, Jones could not be certain that the child understood her questions. Jones escorted L.P. to the school office. She testified that when the supervisor, Cooper, observed L.P.'s injuries, she said, "Whoever seen [sic] him first got to make the call." As a result, Whitley called 696-KIDS and made a report of suspected child abuse.

**{¶ 9}** In response, the Cuyahoga County Department of Child and Family Services ("CCDCFS") sent a social worker to the school to question L.P.  Clark arrived at the school while the social worker was questioning L.P. and denied responsibility for L.P.'s injuries.  Clark then left with the child.

**{¶ 10}** The next day, a social worker located T.T.'s children at the home of Clark's mother and took them to the hospital.  A physician determined that L.P. had bruising in various stages of development and abrasions consistent with having been struck by a linear object and that A.T. had bruising, burn marks, a swollen hand, and a pattern of sores at her hairline.  The physician suspected child abuse and estimated that the injuries occurred between February 28 and March 18, 2010.

**{¶ 11}** A grand jury indicted Clark on one count of felonious assault relating to L.P., four counts of felonious assault relating to A.T., two counts of endangering children, and two counts of domestic violence.  The trial court declared L.P. incompetent to testify but denied Clark's motion in limine to exclude L.P.'s out-of-court identification statements.  Seven witnesses testified regarding the statements made by L.P.: Jody Remington, a Cleveland police detective; Sarah Bolog, a CCDCFS social worker; Howard Little, a CCDCFS intake social worker; Whitley and Jones; the children's maternal grandmother; and the children's maternal great-aunt.  Unexplained in this record, and highlighted by the court of appeals in its opinion, is that the trial court declared L.P. incompetent to testify at the time of trial, yet it permitted testimony about statements this incompetent three-and-a-half-year-old child made to his teachers six months earlier.  The jury found Clark guilty of all charges, except for one count relating to A.T., and the court thereafter sentenced Clark to an aggregate 28-year prison term.

**{¶ 12}** Clark appealed, claiming that the trial court violated his right to confrontation by allowing witnesses to testify about the statements L.P. made to

4

his preschool teachers. The court of appeals held that the trial court abused its discretion when it permitted Detective Remington, Bolog and Little (the social workers), and Whitley and Jones (the preschool teachers) to testify regarding L.P.'s statements, because they were testimonial and their admission violated the Confrontation Clause. *State v. Clark*, 8th Dist. Cuyahoga No. 96207, 2011-Ohio-6623, 2011 WL 6780456, at ¶ 19, 26, 31, and 35. The appellate court reversed Clark's convictions and remanded the matter for a new trial. *Id.* at ¶ 72. We accepted the state's appeal challenging only the exclusion of testimony from Whitley and Jones and asserting that it did not violate the Confrontation Clause; the state did not appeal the decision of the appellate court that testimony from Detective Remington and from social workers Bolog and Little violated the Confrontation Clause and was therefore inadmissible.

## Law and Analysis

### *Teachers as Agents of Law Enforcement*

{¶ 13} Ohio law imposes a duty on all school officers and employees, including administrators and employees of child day-care centers, to report actual or suspected child abuse or neglect. R.C. 2151.421, the source of that duty, provides:

> (A)(1)(a) No person described in division (A)(1)(b) of this
> section who is acting in an official or professional capacity and
> knows, or has reasonable cause to suspect based on facts that
> would cause a reasonable person in a similar position to suspect,
> that a child under eighteen years of age * * * has suffered or faces
> a threat of suffering any physical or mental wound, injury,
> disability, or condition of a nature that reasonably indicates abuse
> or neglect of the child shall fail to immediately report that
> knowledge or reasonable cause to suspect to the entity or persons

specified in this division.  Except as provided in section 5120.173 of the Revised Code, the person making the report shall make it to the public children services agency or a municipal or county peace officer in the county in which the child resides or in which the abuse or neglect is occurring or has occurred.  * * *

(b) Division (A)(1)(a) of this section applies to any person who is an * * * administrator or employee of a child day-care center; * * * administrator or employee of a certified child care agency or other public or private children services agency; school teacher; school employee; school authority * * *.

{¶ 14} In *Yates v. Mansfield Bd. of Edn.*, 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861, ¶ 30, we noted that R.C. 2151.421 imposes mandatory reporting duties on teachers and others listed in the statute because they are among the "most likely and qualified persons to encounter and identify abused and neglected children" and have "the necessary training or skill to detect the symptoms of child abuse."  As the court further explained:

[w]hile * * * the primary purpose of reporting is to facilitate the protection of abused and neglected children rather than to punish those who maltreat them, *it is clear that the General Assembly considered identification and/or prosecution of the perpetrator to be a necessary and appropriate adjunct in providing such protection*, especially in the institutional setting. Thus, R.C. 2151.421(F)(1) and (2) provide that children services agencies shall investigate each report of known or suspected child abuse in cooperation with law enforcement to determine, among other things, "the cause of the injuries * * * and the person or persons

responsible" and "make any recommendations to the county prosecuting attorney or city director of law that it considers necessary to protect *any children* that are brought to its attention."

(Emphasis added in part.) *Id.* at ¶ 25.

{¶ 15} Thus, prosecution for criminal acts of child abuse is expressly contemplated by the reporting statute as a means of protecting children. And in order to effectuate that purpose, R.C. 2151.421(C) requires the person reporting the abuse to provide a written report if one is requested by the receiving agency. Further, a failure to report suspected child abuse is a criminal offense pursuant to R.C. 2151.99(C), and R.C. 2151.421(M) makes a mandated reporter "liable for compensatory and exemplary damages to the child who would have been the subject of the report that was not made."

{¶ 16} Although a teacher's questioning of a child about suspected injury is consistent with a duty to report potential abuse and arises from a concern to protect a child, the United States Supreme Court's Confrontation Clause analysis requires that we ascertain the "primary purpose" for the questioning. Here, the circumstances objectively indicate that the primary purpose of the questions asked of L.P. was not to deal with an existing emergency but rather to gather evidence potentially relevant to a subsequent criminal prosecution. His teachers reacted to manifest signs of child abuse and complied with their statutory and professional duties to report it to child-protection authorities. They did not seem to believe his story that he had fallen and instead focused on who caused the injuries. Notably, Jones's first question on seeing L.P. was "Who did this?" And his teachers did not treat the situation as involving any ongoing medical emergency. L.P. did not complain of his injuries, he did not have any need for urgent medical care, and his teachers did not render any medical treatment. Immediately after L.P. responded, Whitley called 696-KIDS and made a report, and shortly thereafter, a social

worker, Little, arrived at the school to further investigate the allegation of abuse; within two days, both teachers gave formal statements to police.

{¶ 17} The purpose of a teacher's duty to report suspicions of child abuse is to protect children, and information reported to teachers can be used by child-protection agencies to separate the child from a dangerous situation as the investigation unfolds. It can lead to counseling for the family or even the permanent removal of the child from the parents' custody. Here, the information also led to criminal prosecution, and therefore the use of the child's statements implicates the defendant's constitutional rights. When teachers suspect and investigate child abuse with a primary purpose of identifying the perpetrator, any statements obtained are testimonial for purposes of the Confrontation Clause.

*Admission of Out-of-Court Statements*

{¶ 18} The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

{¶ 19} In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the court recognized that the interpretation of the Sixth Amendment articulated in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), could not be reconciled with the historical underpinnings of the Confrontation Clause. It held that the Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford* at 61. Because the Sixth Amendment guarantees the accused's right to confront those who "bear testimony," *id*. at 51, the Confrontation Clause bars admission of testimonial statements unless the witness appears at trial or, if the witness is unavailable, the accused had a prior opportunity for cross-examination. *Id*. at 59. The court explained that "[w]hatever else the term ['testimonial'] covers, it applies at a

minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*. at 68.

{¶ 20} Two years later, the court revisited the issue in the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Both cases involved statements by domestic-violence victims who did not testify at trial: in *Davis*, the victim made statements to a 9-1-1 operator identifying her assailant and describing his whereabouts immediately after an assault, whereas in *Hammon*, the victim made statements to police officers responding to a domestic-violence complaint after they had secured the scene. In those cases, the court distinguished police interrogations that relate to an ongoing emergency from those that relate to past criminal conduct. In considering whether the statements made in the context of those two different situations were testimonial, the court formulated the primary-purpose test: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at 822.

{¶ 21} Applying the primary-purpose test in *Davis*, the court determined that the objective circumstances surrounding the victim's interrogation indicated that "its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 828. The court reasoned that "the nature of what was asked and answered [during the 9-1-1 call], again, viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn * * * what had happened in the past." (Emphasis sic.) *Id*. at 827. In addition, the victim's call "was plainly a call for help against bona

fide physical threat" and involved "frantic answers" given "in an environment that was not tranquil, or even * * * safe." *Id.* Accordingly, the court held that the statements were nontestimonial, and therefore were admissible. *Id.* at 828.

{¶ 22} Application of the primary-purpose test in *Hammon* produced a contrary result: the court concluded that the statements were testimonial and were barred by the Sixth Amendment. *Id.* at 830. The court stated that there was "no immediate threat" to the victim and "no emergency in progress" because the police had separated the abusive husband from the wife, *id.* at 829-830, and it reasoned that when the officer questioned the victim, he was "not seeking to determine (as in *Davis)* 'what is happening' but rather 'what happened.' " *Id.* at 830. The court concluded that "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.*

{¶ 23} Ohio adopted the primary-purpose test in *State v. Siler* and, relying on *Davis*, held that the primary-purpose test applies to a child declarant's statements made to police or to those the court determines to be police agents. In that case, we concluded that a child's statement to a detective, after the crime scene had been secured, was testimonial and not admissible under the Sixth Amendment.

{¶ 24} The United States Supreme Court recently clarified the primary-purpose test in *Michigan v. Bryant*, __ U.S. __, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), providing further explanation of the "ongoing emergency" discussed in *Davis*. In *Bryant*, police officers responded to a call about a shooting and found the victim, Anthony Covington, lying on the ground with a gunshot wound. The officers asked Covington, " 'what had happened, who had shot him, and where the shooting had occurred.' " *Id.* at 1150. Covington told the police that he and the defendant, Richard Bryant, had had a conversation through the back door of the defendant's house. Covington explained that when he turned to leave, he was shot through the door but then drove to the gas station where the police found

him; he died within hours. At trial, the police officers who spoke with Covington testified about what he had said.

{¶ 25} Determining that the primary purpose of the statements was to enable the police to deal with an ongoing emergency, the court held that Covington's statements identifying the shooter as "Rick" and the location of the shooting were nontestimonial statements. *Id.* at 1166-1167. The court emphasized that determining whether the purpose of the interrogation is to deal with an ongoing emergency or to establish past events for later criminal prosecution is a factor in the analysis. *Id.* at 1160. The crux of the analysis of the circumstances of the encounter between the declarant and the police does not involve the subjective or actual purpose of the participants in the encounter but "the purpose that reasonable participants would have had" as determined from the participant's statements and actions and the circumstances involved. *Id.* at 1156. The focus must be on the perspective of the parties at the time of the interrogation and not in hindsight. "If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause." *Id.* at 1157, fn. 8.

{¶ 26} The court explained that "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id*. at 1158. It noted that the zone of potential victims is more narrow in domestic-violence cases than in cases of public threat and that the neutralization of harm to the first victim does not end the assessment of whether an emergency is ongoing, because there may be a continuing threat to first responders or the public at large. *Id.*

{¶ 27} In addition, the court reiterated its earlier observation that " 'a conversation which begins as an interrogation to determine the need for emergency assistance' " can " 'evolve into testimonial statements.' " *Id*. at 1159, quoting *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224. This evolution

occurs, for example, when "a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute" or when "a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public." *Id.*

{¶ 28} Although the existence of an ongoing emergency is important, the court stressed that it is but one factor to be considered when determining the primary purpose of an interrogation. *Id.* The informality of the encounter might also be assessed, because "formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution.' " *Id.*, quoting *Davis* at 822. Because the police had encountered a "fluid and somewhat confused" situation, *id.* at 1166, the court in *Bryant* concluded that the questioning by police lacked formality because it "occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion." *Id.* at 1160.

{¶ 29} "In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id.* The court further stated that objectively determining the primary purpose of the interrogation, by examining the statements and actions of the participants, was the approach most consistent with its past holdings. *Id.* at 1162.

{¶ 30} Applying the primary-purpose test to L.P.'s statement compels the conclusion that it was testimonial; no ongoing emergency existed, nor had L.P. complained about his injuries or needed emergency medical care. Rather, his teachers acted to fulfill their duties to report abuse. In fact, Whitley testified that "when the children come in, we're supposed to always observe them, look for different things, what's going on with them." At a minimum, when questioning a

12

child about suspected abuse in furtherance of a duty pursuant to R.C. 2151.421, a teacher acts in a dual capacity as both an instructor and as an agent of the state for law-enforcement purposes.

{¶ 31} Here, the nature and focus of the questions asked indicate a purpose to ascertain facts of potential criminal activity and identify the person or persons responsible. Thus, because the teachers acted as agents of the state for law-enforcement purposes, the appropriate test to be applied is the primary-purpose test. *Bryant* directs that the statements and actions of an interrogator as well as a declarant must be examined to determine the primary purpose of the declarant's statements.

{¶ 32} The record reveals that no emergency existed either at the time Whitley observed L.P. or when Jones questioned him. His teachers were "shocked" by his injuries and immediately suspected child abuse; they separated L.P. from other students and in a formal question-and-answer format, they sought facts concerning past criminal activity to identify the person responsible, eliciting statements that "are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-311, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), quoting *Davis*, 547 U.S. at 830, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 33} Thus, the primary purpose of that inquiry was not to extricate the child from an emergency situation or to obtain urgently needed medical attention, but rather was an information-seeking process to determine what had occurred in the past and who had perpetrated the abuse, establishing past events potentially relevant to later criminal prosecution. L.P.'s statements identifying Clark as responsible for his injuries are therefore testimonial and should have been excluded from evidence pursuant to the Confrontation Clause.

**Conclusion**

**{¶ 34}** For these reasons, the admission of L.P.'s statements violated Clark's right to confrontation, and the judgment of the court of appeals is affirmed.

**{¶ 35}** The passionate rant of the dissent and its parade of horribles to the contrary, today's majority decision supports a basic constitutional right guaranteed to all accused of crime by the Sixth Amendment of the United States Constitution: "the right * * * to be confronted with the witnesses against him." In this case, a three-year-old allegedly uttered a statement identifying Clark but never testified in court because the judge determined him to be incompetent to testify at trial six months after he had uttered the identification.

**{¶ 36}** Statements elicited from a child by a teacher in the absence of an ongoing emergency and for the primary purpose of gathering information of past criminal conduct and identifying the alleged perpetrator of suspected child abuse are testimonial in nature in accordance with *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and *State v. Siler,* 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534.

Judgment affirmed.

PFEIFER, KENNEDY, and O'NEILL, JJ., concur.

O'CONNOR, C.J., and LANZINGER and FRENCH, JJ., dissent.

_____

**O'CONNOR, C.J., dissenting.**

**{¶ 37}** The majority decision creates confusion in our case law, eviscerates Evid.R. 807, and threatens the safety of our children. Not surprisingly, it is also wrong as a matter of federal constitutional law. I dissent.

**{¶ 38}** A teacher is not an agent of law enforcement for the purpose of determining whether a statement is testimonial under the Confrontation Clause merely because that teacher has a statutory duty to report child abuse. On the

record before us, there is no basis from which to conclude that the injured child's teachers acted on behalf of law enforcement. Therefore, there is no support in the law or on these facts for the conclusion that the statements made to the teachers by L.P., the injured child, or similar statements made to teachers in any Ohio schoolroom, should be scrutinized under a test that is otherwise applicable only when the interviewer is an agent of law enforcement. *See Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

{¶ 39} Instead, statements to teachers should be scrutinized under the objective-witness test, which is applicable when the questioner is not an agent of law enforcement. In this appeal, the teachers questioned L.P. about his injuries to protect L.P. and possibly other students from additional injury, and to maintain a secure and orderly classroom in which learning could take place. No objective witness could reasonably believe that the interviews served a prosecutorial purpose rather than a protective one. Thus, under the law of this court and the United States Supreme Court, I would hold that the classroom statements made by this small child, L.P., to his teachers are nontestimonial and thus are not excluded by the Confrontation Clause.

## RELEVANT FACTS

{¶ 40} Appellee, Darius Clark, and his girlfriend, "T.T.,"[1] were indicted on multiple counts of felonious assault, child endangerment, and domestic violence stemming from Clark's physical abuse of T.T.'s son, L.P., who was three and one-half years old, and her daughter, A.T., who was nearly two years old.

{¶ 41} Before trial, the trial court ruled that L.P. was not competent to testify at trial, and Clark moved to exclude testimony regarding any out-of-court statements made by L.P. about the abuse. Clark argued that the introduction of

---

1. T.T. is an adult. But because she has the same last name as her child, A.T., who was one of the victims, I use T.T.'s initials in order to protect A.T.'s identity. T.T. pled guilty to child endangerment, domestic violence, and permitting child abuse and agreed to testify against Clark. She was sentenced to eight years' imprisonment.

those statements would violate his constitutional right to confront a witness against him. The trial court denied the motion.

{¶ 42} At trial, T.T. testified that she started dating Clark in early 2008 and that the two began living together soon thereafter. By May 2009, Clark had become her pimp, and T.T. regularly took the Greyhound bus from Cleveland to Washington, D.C., to engage in prostitution. At first, T.T.'s family watched her two children while she was in Washington, D.C. But eventually, she began leaving L.P. and A.T. with Clark. And she continued to do so even after she realized that Clark was physically abusing the children. T.T. testified that around midnight, March 16, 2010, she left for Washington, D.C., to engage in prostitution. She left L.P. and A.T., unharmed, in Clark's care.

{¶ 43} The next day, March 17, 2010, at approximately 1:00 p.m., Clark dropped L.P. off at his school, William Patrick Day School, which was operated by the Council for Economic Opportunities of Greater Cleveland Head Start. Ramona Whitley, one of L.P.'s teachers, saw L.P. in the lunchroom and noticed that his eye was bloodshot or bloodstained. She asked him, "What happened?" He told her that he had fallen. Whitley then asked, "How did you fall and hurt your face?" L.P. again said that he had fallen. Whitley noted that L.P. was not as talkative as usual and wouldn't eat.

{¶ 44} When L.P. went into the classroom, he played at a table. In the brighter light of the classroom, Whitley noticed additional injuries. She saw red marks on L.P.'s head "like whips of some sort" and welts on his face. Whitley testified that she was "kind of like in shock" and asked, "Oh, what happened?"

{¶ 45} Whitley then got the attention of the lead teacher, Debra Jones, and asked her to look at L.P. At this time, Jones saw L.P.'s bloodshot or bloodstained eye and some "redness" around his neck. Jones immediately said, "Whoa, what happened?" and "Who did this? What happened to you?" Jones testified that L.P. seemed "kind of bewildered" but then said something like "Dee, Dee." Jones,

wanting to know if L.P. was talking about another child, asked, "Is he big or little?" Jones testified that L.P. said, "Dee is big."

{¶ 46} Because Jones did not want to embarrass L.P. or alarm any of the children, she took L.P. to the office of her supervisor, Ms. Cooper. Jones testified that Cooper asked L.P. if she could see his shirt. When Cooper raised L.P.'s shirt, Jones saw red marks on L.P.'s body. It was only at this point—after the child was taken to the supervisor's office—that the decision was made to report a suspicion that L.P. had been abused. Because Whitley had first observed L.P.'s injuries, Cooper directed her to call the child-abuse-reporting hotline. Whitley did so.

{¶ 47} The county children's services agency investigated Whitley's report. Howard Little, a social worker with the county children's services agency, went to the school. He saw L.P.'s injuries and talked with the child. When Clark arrived at the school, Little began to question him. Clark grabbed L.P. and walked out, even though Little tried to stop him. Clark got into a car that was parked in front of the school and drove off. Little was unable to get the license plate.

{¶ 48} The agency was unable to find L.P. until the next day, when another social worker, Sarah Bolog, and her supervisor tracked him and his sister, A.T., down at the home of Clark's mother. Bolog testified that she confirmed L.P.'s injuries and she discovered very serious injuries on A.T., including two black eyes and a large burn on her cheek. Bolog called 9-1-1. Both children were taken to the hospital after the police arrived.

{¶ 49} A jury convicted Clark of all but one count set forth in the indictment. He was sentenced to an aggregate term of imprisonment of 28 years. In reversing the conviction, the Eighth District Court of Appeals concluded that the primary purpose of the teachers' questioning was to report potential child abuse to law enforcement and thus that L.P.'s answers were testimonial. 2011-Ohio-6623 at ¶ 35. I would reverse that holding.

## ANALYSIS

### A

### The right to confrontation generally

{¶ 50} The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." But "not all hearsay implicates the Sixth Amendment's core concerns." *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant had had a prior opportunity to cross-examine the witness. *Id.* at 53-54.

{¶ 51} *Crawford* did not define "testimonial" but stated generally that the core class of statements implicated by the Confrontation Clause includes statements " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Id.* at 52, quoting Brief of Amicus Curiae National Association of Criminal Defense Lawyers 3. The court expressly linked testimonial statements to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

{¶ 52} But the *Crawford* court declined to specifically decide which police interrogations are implicated by the Confrontation Clause because it recognized that the statement at issue in that case, a recorded statement knowingly given by a witness in custody and in response to structured police questioning, qualified as a police interrogation "under any conceivable definition." *Id*. at 53, fn. 4.

### United States Supreme Court cases explaining "testimonial"
### in the context of police interrogations

{¶ 53} Two years after *Crawford*, the court addressed the term "testimonial" in the context of police interrogations. *Davis*, 547 U.S. 813, 126

S.Ct. 2266, 165 L.Ed.2d 224. The court held that statements made in the course of police interrogations are "testimonial when the circumstances objectively indicate that there is no * * * ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. In doing so, it made clear that not all statements made to police officers are testimonial. *Id.*

**{¶ 54}** Moreover, *Davis* did not hold that only those statements made to police officers in response to an immediate danger are nontestimonial. *Id.*; *see State v. Krasky*, 736 N.W.2d 636 (Minn.2007). Rather, "the precise question was whether emergency calls to police are treated differently than statements made in the regular course of a police interrogation." *Krasky* at 643, quoting *Davis* at 822. As the *Davis* court explained, it was not "attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial." *Davis* at 822.

**{¶ 55}** The United States Supreme Court recently clarified the *Davis* police-interrogation test. *Michigan v. Bryant*, ___U.S.___, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93 (2011). In doing so, it explained that the *Davis* police-interrogation test recognizes that "[p]olice officers in our society function as both first responders and criminal investigators." *Id.* at 1161.

**{¶ 56}** In both *Crawford* and *Bryant*, police questioning elicited the statements admitted at trial, and in *Davis*, a 9-1-1 operator elicited the statements. The court in *Davis* assumed (but did not decide) that 9-1-1 operators are agents of the police when they conduct interrogations of 9-1-1 callers. *Davis*, 547 U.S. at 823, 126 S.Ct. 2266, 165 L.Ed.2d 224, fn. 2. And it explained that it had the luxury of indecision on this point because it determined that the statements to the 9-1-1 operator were nontestimonial, even if the operator was an agent of law enforcement. *Id.* That tack made it "unnecessary to consider whether and when

statements made to someone other than law enforcement personnel are 'testimonial.' " *Id.* Notably, both the majority and a dissent in *Bryant* acknowledged the question left open by *Davis* and both stated that *Bryant* also left the question open because the statements in *Bryant* were also elicited by police officers. *Bryant* at 1155, fn. 3. Thus, contrary to the majority's suggestion that *Davis* compels the conclusion that L.P.'s statements to his teachers were testimonial, the United States Supreme Court has yet to decide under what circumstances statements are testimonial when they are made to someone other than law-enforcement personnel.

{¶ 57} But as is instructive here, the court has repeatedly held that courts must identify the primary purpose of an out-of-court statement by applying an objective test. *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221, 2243, 183 L.Ed.2d 89 (2012), citing *Bryant* at 1156.

**Ohio Supreme Court cases explaining "testimonial" in the context of questioning by persons other than law-enforcement officers**

{¶ 58} In our decision in *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, rendered the same year that the United States Supreme Court decided *Davis*, we applied *Crawford* and answered the question identified but not answered by *Davis*.

{¶ 59} We held that statements made in response to questions by a medical professional in a unit specializing in the care of sexual-assault victims were made primarily for a medical purpose and were nontestimonial, despite the unit's purpose to assist law enforcement. *Stahl* at ¶ 39, 46; *see also State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 28 (discussing the reasoning of *Stahl*). We stated that the case did not involve a police interrogation, even though a police officer remained in the room while the medical professional interviewed the victim. *Id.* at ¶ 18. We also adopted the objective-witness test, which provides that statements made to someone other than law-enforcement

personnel are testimonial only when an objective witness would reasonably believe that the questioning served primarily a prosecutorial purpose. *Stahl* at ¶ 36.

{¶ 60} In *Stahl*, a woman appeared at a police station and reported that she had been raped by her boyfriend's former boss, James Stahl. After taking a detailed report, a police officer transported the woman to a Developing Options for Violent Emergencies ("DOVE") unit at the local hospital, where she signed a consent form agreeing to release any evidence, information, clothing, and photographs for prosecution of the case. A nurse practitioner asked about her medical history and the alleged assault and performed a physical examination, during which physical evidence, including DNA, was collected and preserved. Five weeks later, the woman died from an unrelated disorder, without having given any formal testimony.

{¶ 61} The state charged Stahl with one count of rape and one count of kidnapping. In the trial court, the victim's statements to the nurse practitioner were suppressed. In an interlocutory appeal, the Ninth District Court of Appeals reversed after concluding that the statements were nontestimonial. We affirmed. *Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 48.

{¶ 62} We acknowledged that the DOVE unit "partly serve[d] a prosecutorial function by collecting evidence." *Id.* at ¶ 39. But we concluded that the prosecutorial function was at best secondary to the unit's primary purpose of patient care. *Id.*

{¶ 63} We rejected Stahl's claims that the DOVE unit's mission statement, which expressly embraced the unit's role in assisting law enforcement, or its economic support from the attorney general's office, compelled the conclusion that the alleged victim's statements to the nurse practitioner were testimonial. *Id.* at ¶ 40-41. We applied the objective-witness test and explained that "[n]othing in the record establishes that a reasonable witness in the [victim's]

position would believe that the DOVE unit serves primarily a prosecutorial function." *Id.* at ¶ 40. We emphasized that there was no reason to believe that the patient would have been aware of the unit's stated mission or its funding source. *Id.* at ¶ 40-41.

{¶ 64} We similarly rejected Stahl's argument that the language of a consent form, which stated that evidence gleaned from the medical examination would be used in the prosecution, demonstrated that "a reasonable person in the [victim's] position would have expected the police to use her statement in the prosecution of a crime." *Id.*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 45. We noted that the consent form referred only to the physical evidence that was collected, not to any statements that were elicited. *Id.* at ¶ 47. We explained that the victim could have reasonably assumed that identifying the person who had attacked her to a medical professional would serve a medical purpose, i.e., to determine whether she had been exposed to and therefore required treatment for any sexually transmitted diseases and to structure a plan for her safe release. *Id.* at ¶ 46.

{¶ 65} We found that Stahl's argument that the nurse practitioner was an agent of law enforcement merely because she had consulted with the police about whether a rape-evidence-collection kit would be useful was flawed. We emphasized that in determining whether the victim's statements are testimonial, "courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *Id.* at paragraph two of the syllabus. Because there was no evidence that the victim knew of the nurse practitioner's discussion with the officer about the rape-evidence-collection kit, the discussion "could not be relevant in determining [the victim's] reasonable expectations in submitting to the examination." *Id.* at ¶ 42.

**{¶ 66}** *Stahl* addressed the applicability of the objective-witness test when the police had escorted the victim to the DOVE unit for examination and the nurse there had consulted a police officer before collecting and preserving evidence. *Stahl* contrasts starkly with the case before us, in which L.P. was questioned by his teachers long before law enforcement was contacted.

**{¶ 67}** We next applied the objective-witness test in *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944. In *Muttart*, a woman contacted the police station and reported that her friend's four-and-one-half-year-old daughter, A.M., had described being sexually assaulted by her father, Dennis Muttart. After the police investigated, the mother took A.M. to a physician. That physician referred A.M.'s mother to the Child Maltreatment Clinic at a hospital in Toledo to be seen by a specialist in the treatment of children who have been sexually abused. A social and medical history was collected from A.M. During this interview, A.M. described in detail how Muttart had sexually abused her. Based on the child's statements, a doctor recommended that she be "afforded complete protection from the alleged perpetrator" and that both she and her mother undergo counseling. *Id.* at ¶ 17.

**{¶ 68}** A.M.'s mother took the child for counseling. A clinical counselor interviewed A.M. Although A.M. did not tell the counselor that she had been abused, A.M. did tell the counselor that she did not want to see Muttart. A.M. later told another counselor in detail how Muttart had sexually abused her.

**{¶ 69}** We concluded that the admission of A.M.'s out-of-court statements to the medical professionals did not offend the Confrontation Clause. *Id.* at ¶ 61. We applied the objective-witness test because the statements were not elicited as part of a police investigation or in a sworn statement to preserve them for trial, and they were not fostered by the state but were made for a purpose other than law enforcement, i.e., for medical diagnosis and treatment. *Id.* The later use of

the statements at trial by the state did not "change the fact that the statements were not made for the state's use." *Id.* at ¶ 62.

{¶ 70} Thus, in *Stahl* and *Muttart*, in which the questions eliciting the statements were not asked as part of a police interrogation, we held that the objective-witness test was applicable. Such is the case here.

### Selecting the proper test

{¶ 71} In order to determine whether a statement is testimonial, based upon precedent from the United States Supreme Court and this court's law, we must first determine which test to apply. The *Davis* police-interrogation test must be applied if the interviewer is a law-enforcement officer or asks questions on behalf of law enforcement. Otherwise, the objective-witness test must be applied. In order to decide which test to apply, the dispositive inquiry is the presence or absence of a law-enforcement interrogator. *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 28.

{¶ 72} With these governing principles in mind, I turn my attention to the out-of-court statements at issue here.

### B

### This was not a police interrogation

*Teachers are not law enforcement and these teachers did not question*

*L.P. at the direction of law enforcement*

{¶ 73} The teachers were clearly not law-enforcement officers. Whitley and Jones were employed by the Council for Economic Opportunities of Greater Cleveland Head Start, not by a law-enforcement agency. And there is absolutely no indication that these teachers questioned L.P. for law enforcement. *Compare State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 35-36 (*Davis* applies when an interviewer who is not a law-enforcement officer asks questions on behalf of law enforcement). Police did not, for example, ask the teachers, who had a relationship with the child, to question the child on their

24

behalf. Police did not tell the teachers what questions to ask. Police did not observe the questioning. The police were not even aware of L.P. at the time the teachers questioned him. *Compare id.* at ¶ 31. The police simply were not involved in the questioning in any way.

{¶ 74} Therefore, Jones and Whitley should be treated as law-enforcement interrogators for Confrontation Clause purposes only if they can be deemed agents of law enforcement because they had a duty to report child abuse.

*Teachers are not law enforcement merely because*

*they have a mandatory duty to report child abuse*

{¶ 75} The United States Supreme Court has yet to decide whether a duty to report child abuse under state law transforms a civilian into a law-enforcement agent for purposes of Confrontation Clause analysis. For the reasons that follow, I would hold that it does not. A person who asks a child questions about an injury is not acting on behalf of law enforcement merely because she is required to report abuse or a suspicion of abuse. This conclusion is compelled by the purpose of Ohio's child-abuse-reporting statute and the duty that it imposes.

Ohio's child-abuse-reporting statute

{¶ 76} "Child abuse is a pervasive and devastating force in our society." *Yates v. Mansfield Bd. of Edn.,* 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861, ¶ 12. "It has long been considered 'a problem of epidemic proportions. * * * By 1973, child abuse was recognized as the most common cause of death of small children in the United States.' " *Id.*, quoting 6 American Jurisprudence Proof of Facts 2d, Failure to Report Suspected Case of Child Abuse, Section 1, at 351 (1975). Child abuse is not confined to the home. *Id.* Tragically, children are also sometimes abused and neglected by the institutions meant to care for them. *Id.*

{¶ 77} Because children are often helpless to protect themselves, the legislatures in all 50 states, the District of Columbia, and three territories have enacted child-abuse-reporting statutes. *Id.* at ¶ 13. In Ohio, R.C. 2151.421 is the

"mechanism for identifying and protecting abused and neglected children." *Id.* at ¶ 24. R.C. 2151.421 requires certain persons, including teachers, to report suspected child abuse or neglect discovered in an official or professional capacity.[2] *See Campbell v. Burton*, 92 Ohio St.3d 336, 342, 750 N.E.2d 539 (2001). The statute requires the persons designated to report any knowledge or reasonable cause to suspect that a child has suffered or faces a threat of suffering any injury that reasonably indicates abuse or neglect. The statute was "intended to reach potential victims of child abuse, as well as children who have already suffered abuse." *Yates,* 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861*,* ¶ 24.

{¶ 78} Thus, "the primary purpose of reporting is to facilitate the protection of abused and neglected children rather than to punish those who maltreat them." *Id.* at ¶ 25. The General Assembly "considered identification and/or prosecution of the perpetrator to be a necessary and appropriate *adjunct* in providing such protection." (Emphasis added.) *Id.* But any prosecutorial purpose is secondary. *Id.*

{¶ 79} In order to achieve the goal of protecting children from abuse and neglect, "the General Assembly had to encourage those with special relationships with children, such as doctors and teachers, to report known or suspected child abuse." *Campbell*, 92 Ohio St.3d at 342, 750 N.E.2d 539. The following persons are required to report knowledge of or a suspicion of abuse or neglect:

> any person who is an attorney; physician, including a hospital
> intern or resident; dentist; podiatrist; practitioner of a limited
> branch of medicine as specified in section 4731.15 of the Revised

---

2. Anyone, including a person who has no duty to report abuse or a person who has a duty to report but gains knowledge of the abuse in an unofficial capacity, may report that information. R.C. 2151.421(B).

Code; registered nurse; licensed practical nurse; visiting nurse; other health care professional; licensed psychologist; licensed school psychologist; independent marriage and family therapist or marriage and family therapist; speech pathologist or audiologist; coroner; administrator or employee of a child day-care center; administrator or employee of a residential camp or child day camp; administrator or employee of a certified child care agency or other public or private children services agency; school teacher; school employee; school authority; person engaged in social work or the practice of professional counseling; agent of a county humane society; person, other than a cleric, rendering spiritual treatment through prayer in accordance with the tenets of a well-recognized religion; employee of a county department of job and family services who is a professional and who works with children and families; superintendent, board member, or employee of a county board of developmental disabilities; investigative agent contracted with by a county board of developmental disabilities; employee of the department of developmental disabilities; employee of a facility or home that provides respite care in accordance with section 5123.171 of the Revised Code; employee of a home health agency; employee of an entity that provides homemaker services; a person performing the duties of an assessor pursuant to Chapter 3107 or 5103 of the Revised Code; or third party employed by a public children services agency to assist in providing child or family related services.

R.C. 2151.421(A)(1)(b).

{¶ 80} The statute recognizes that the designated persons, "when acting in their official or professional capacity, hold unique positions in our society. They are not only the most likely and qualified persons to encounter and identify abused and neglected children, but they are often directly responsible for the care, custody, or control of these children in one form or another." *Yates,* 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861*, ¶* 30.

{¶ 81} Each of the persons required to report, including teachers, interacts with children in their professional or official capacity independently of a duty to report abuse. Each is in some way already responsible for the care and protection of children. *Id.*

{¶ 82} "The primary duty of school officials and teachers * * * is the education and training of young people." *New Jersey v. T.L.O.*, 469 U.S. 325, 350, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Powell, J., concurring). To that end, schools have a legitimate need to maintain a secure and orderly environment in which learning can take place. *Id.* at 340 (majority opinion). Similarly, teachers have "a special responsibility to protect those children committed to their care and control." *Yates*, 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861, at ¶ 45.

{¶ 83} The duty to report abuse does not change the official or professional capacity of teachers or anyone required to report abuse or neglect. The duty is to report knowledge or suspicion of abuse or neglect that the designated persons encounter while doing their ordinary work. Therefore, the duty to report child abuse does not change the primary purpose of the designated professionals' interaction with children.

{¶ 84} Moreover, there is absolutely no indication that the General Assembly intended to deputize mandatory reporters as agents of law enforcement. The reporting statute does not impose a duty to ask any questions about suspicious injuries or conditions or to undertake any investigation. A person who is required to report abuse might make inquiry into a suspicious situation, as the

teachers here did, but such an inquiry stems not from the statutory duty to report child abuse or neglect.  It comes from a professional responsibility or concern for the child—to find out what happened to the child.  Teachers, by way of apt example, have a professional responsibility upon observing a student's injuries to inquire about those injuries, to protect that child and the other children in the classroom, and to maintain a safe and structured environment in which learning can take place.  It would be negligent, if not reckless, for a teacher to fail to inquire about the source of newly inflicted, serious injuries on a small child in her care, irrespective of R.C. 2151.421.

{¶ 85} What the statute requires is actually quite minimal: when teachers, or others who are required to report, encounter suspected abuse or neglect in their official capacity, they must report it.  In turn, the children's services agency or the police—not the mandatory reporters—are responsible for investigating the injury or condition "to determine the circumstances surrounding the injuries, abuse, or neglect or the threat of injury, abuse, or neglect, the cause of the injuries, abuse, neglect, or threat, and the person or persons responsible."  R.C. 2151.421(F)(1).  That any information received  by one who is required to report may cause the state to initiate an investigation or may later be used by the state for another purpose—to prosecute a perpetrator—"does not change the fact that the statements were not made for the state's use."  *Muttart,* 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, at ¶ 62.

{¶ 86} It does not appear that any court has held that a mandatory reporter is an agent of law enforcement when, as here, there is no police involvement in the interview.[3]  But several courts have held that a mandatory reporter is not an

---

3.  My research discloses that there is one Illinois case, a plurality decision, that might be construed to support the majority's position.  *People v. Stechly*, 225 Ill.2d 246, 312 Ill.Dec. 268, 870 N.E.2d 333 (2007).  But the court in that case stated, "We are not holding that every mandated reporter acts as an agent of law enforcement in every interview."  *Id.* at 301.  And numerous

agent of law enforcement when there is little or, as here, no police involvement. *E.g., United States v. Squire*, 72 M.J. 285, 288-289 (Armed Forces Cir.2013) (refusing to classify a physician as an agent of law enforcement when there was no direct law-enforcement involvement in the questioning, even though the physician had a mandatory duty to report child abuse, conducted a forensic examination on a child, and completed state-mandated forms to report suspected child abuse; the primary purpose of the interview was medical diagnosis and treatment); *Seely v. State*, 373 Ark. 141, 154-155, 282 S.W.3d 778 (2008) (refusing to classify a social worker as an agent of law enforcement when the police did not "instigate, observe, or participate in" the questioning, even though the social worker was a mandatory reporter and was tasked with interviewing all children brought to the hospital for treatment of physical or sexual abuse; the primary purpose of the interview was to ensure the victim's continued safety and to define the scope of the medical examination); *State v. Spencer*, 2007 MT 245, 339 Mont. 227, 169 P.3d 384, ¶ 18, 20-21 (refusing to classify a licensed foster parent and social worker as agents of law enforcement when there was no indication that the social worker knew that police awaited the results of her interview with a child who was the victim of sexual assault; (1) the social worker's interview was solely for the purpose of counseling the child and (2) the child's statements to the foster parent were spontaneous and not the result of questioning); *Krasky*, 736 N.W.2d at 641-643 (concluding that the primary purpose of a nurse's interview of a child victim was to assess and protect the child's health and welfare in accordance with the state law that required the nurse to report child abuse); *State v. Bobadilla*, 709 N.W.2d 243, 254-255 (Minn.2006) (recognizing that the purpose of the Minnesota statute requiring certain people to report child abuse is to protect the health and welfare of children; therefore, the

---

decisions in that state call *Stechly* into question. *See, e.g., People v. Richter*, 2012 IL App. (4th) 101025, 365 Ill.Dec. 158, 977 N.E.2d 1257, at ¶ 163.

primary purpose of a family-services worker's interview of a child was to assess the child's risk, identify any need for social services, protect the welfare of the abused or neglected child, and prevent further abuse, not to produce a statement for trial).[4]

**{¶ 87}** For all of these reasons, I would hold that a teacher asking a child questions about an injury is not an agent of law enforcement for the purposes of determining whether a statement is testimonial and thus excluded by the Confrontation Clause merely because the teacher has a legal duty to report child abuse pursuant to state statute.

**{¶ 88}** The majority reaches the opposite conclusion and therefore applies the *Davis*, police-interrogation test. By doing so, it proceeds on the assumption that the teachers could have only two purposes for interacting with L.P.—to resolve an emergency or to create evidence against Clark. Because it concludes that there was no emergency, it concludes that the statements were elicited so that they could be used at Clark's trial. That analysis fails to acknowledge the purpose for which the teachers and the student were together in the first place. And it fails to account for a teacher's duty to protect her students and to maintain a secure and orderly classroom in which learning can take place.

**{¶ 89}** What follows is in my view, the far sounder approach.

---

4. If the majority is correct that as a matter of federal constitutional law, a person asking questions of a child is an agent of law enforcement merely because she has a mandatory duty to report child abuse, what is the application of the majority's decision in the 18 states and Puerto Rico, where *any person* who suspects child abuse has a mandatory duty to report? United States Department of Health and Human Services, *Mandatory Reporters of Child Abuse and Neglect,* available at www.childwelfare.gov/responding/mandated.cfm (accessed Aug. 21, 2013).

## C

## Viewed objectively, the teachers' primary purpose in questioning L.P. was not to accuse Clark or to create evidence for use at his trial

{¶ 90} A reasonable person would believe that Whitley and Jones questioned L.P. to protect him and to maintain a safe and structured classroom, not to create evidence for use at Clark's trial.

{¶ 91} Context is important. The teachers' questioning of L.P. bears no resemblance to the formal, stationhouse interrogation in *Crawford*. The questioning took place in a classroom, not in a police station, not at a crime scene, not on a 9-1-1 telephone call. The classroom is a place associated with education and training, nurturing and guidance. Only teachers and students—no police— were present in the classroom.

{¶ 92} Moreover, the questioning was informal and spontaneous and thus strongly suggests that the teachers were questioning L.P. in an attempt to protect him. Whitley noticed a single injury to L.P.'s eye when they were in the lunchroom. In the classroom, she saw other marks on his face. Shocked by the injuries, Whitley did not yet know how L.P. had been injured. She immediately questioned L.P. on the spot: "Oh, what happened?"[5] Whitley then notified the teacher in charge, Jones. Jones approached L.P. in the classroom. Jones also immediately questioned L.P. on the spot in the classroom. When she first saw L.P., Jones exclaimed "Whoa, what happened?" Jones testified that L.P. seemed "kind of bewildered" but then said something like "Dee, Dee." Jones, wanting to know if L.P. was talking about another child, asked, "Is he big or little?" Jones testified that L.P. said, "Dee is big." Once Jones heard that someone had caused the injuries, she removed L.P. from the classroom to save him from

---

5. The questions posed by the teachers are the same as those posed in *Bryant* and approved by the court as not eliciting testimonial statements, even when posed by police officers. *Bryant*, ___U.S. at ___, 131 S.Ct. at 1166, 179 L.Ed.2d 93.

embarrassment and to avoid alarming any of the other children. In other words, Jones removed L.P. from the classroom to maintain order in the classroom.

**{¶ 93}** The questioning was also fluid and somewhat confusing. L.P. was very young, only three and one-half years old, and had been seriously injured. Jones testified that L.P. seemed "bewildered." L.P.'s statements were reflexive because he answered a different question than the one asked. When asked what happened, L.P. answered not "what" but "who." As the teachers were questioning the child, they did not know whether a person had deliberately caused the injuries or whether the child might have fallen or accidentally been hurt. They did not know whether he had an eye infection, whether another student had elbowed him, or whether L.P. had accidentally stuck a pencil in his own eye. They did not know if the injuries had happened at home, at school, or somewhere else. Even when they heard what they thought was a name, they had no way of knowing whether L.P.'s injuries were a result of abuse or of an accidental injury from playing with another child. It was only when they learned that Dee was big that they began to understand that an adult, not a child, had caused the injuries. The teachers' questioning allowed them to understand that Dee, someone whose name they did not recognize, had caused the injuries. Therefore, it enabled them to determine that L.P.'s injuries had not been caused by anyone in the school. The teachers' questions allowed them to determine whether something was happening in the classroom or on the school grounds that they needed to address, i.e., to protect L.P. at that moment, and to maintain order in the school.

**{¶ 94}** An objective witness would reasonably believe that the teachers' questions enabled them to adequately assess the risk of harm for both L.P. and the other children in the school, that when they asked L.P. what had happened, it was to understand how he had been injured and, if necessary, to protect him and the other students from a school-based danger and to maintain a secure and orderly

classroom in which learning could take place, not to create evidence for Clark's trial.

## D

### The wake of the majority's decision: the state of the law in Ohio

{¶ 95} The majority reaches an illogical result, the straightforward application of which dictates that when a teacher notices that a child is hungry and asks whether the child had breakfast, the teacher is a police interrogator because the child might disclose reportable neglect. When a licensed psychologist questions a child about insomnia, the majority would conclude, the psychologist is a police interrogator because the child might disclose reportable abuse. When a dentist observes an injury in a child's mouth and asks the child "what happened," under the majority holding, the dentist is an agent of law enforcement for Confrontation Clause purposes. Common sense dictates that those conclusions are incorrect. So does our case law. *See Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, at ¶ 63 (statements made to a social worker and counselors—who are required to report suspected abuse—did "not even remotely" implicate the evils that the Confrontation Clause was designed to avoid, because the statements were elicited for the purpose of medical diagnosis and treatment), and *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 33 (statements made to a social worker—who is required to report abuse—for the purpose of medical diagnosis and treatment were not testimonial). *See also In re J.M.*, 4th Dist. Pike No. 08CA782, 2009-Ohio-4574, at ¶ 49 (concluding that *Muttart* foreclosed the argument that out-of-court statements are testimonial merely because they are made to a mandatory reporter). At least before today, it did.

{¶ 96} The majority effectively overrules *Muttart* and modifies the bedrock of *Stahl*. At first blush, the holding in *Stahl*—that an adult's statements to a medical professional are analyzed under the objective-witness test—would

remain undisturbed. In *Stahl,* we applied the objective-witness test to a woman's out-of-court statements to a nurse practitioner. A nurse practitioner is required to report suspected child abuse or neglect. *See* R.C. 2151.421(A)(1)(b). According to the majority's reasoning in the present case, statements to a nurse practitioner performing a sexual-assault examination on a child would be analyzed under the *Davis*, police-interrogation test, not the objective-witness test used in *Stahl*. Confrontation Clause law does not countenance such a conclusion. *See Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 41 (declining to apply the objective-witness test when a police officer questioned a child because the identity of the interrogator, not the age of a declarant, determines which test should be applied).

{¶ 97} The problems with the majority's decision do not end there.

{¶ 98} Consider that the duty to report abuse includes the duty to report a suspicion about abuse or neglect of persons with developmental disabilities. R.C. 2151.421(A)(1)(a) (the duty to report abuse or neglect extends to the age of 21 for persons with developmental disabilities) and 5123.61(C) (imposing a duty to report suspected abuse or neglect of a person with mental retardation or developmental disabilities on several classes of people, including licensed nurses). The majority's holding now requires that statements made to a nurse practitioner by an adult who does not have a developmental disability must be assessed under the objective-witness test, but statements to a nurse practitioner by an adult with developmental disabilities must be analyzed under the *Davis* police-interrogation test because the nurse practitioner has a mandatory duty to report suspected abuse or neglect of that patient.

{¶ 99} It gets more complicated.

{¶ 100} Under R.C. 5101.61, certain people, including registered nurses, have a duty to report suspicions of abuse, neglect, or exploitation of an adult who is at least 60 years of age and who is "handicapped by the infirmities of aging or

who has a physical or mental impairment which prevents the person from providing for the person's own care or protection." R.C. 5101.60. Under today's ruling, *Stahl* has been refined to require that statements made by those adults are also analyzed under the *Davis* police-interrogation test.

{¶ 101} The net effect of the majority's holding is to treat differently out-of-court statements made by those who are the most vulnerable and the most in need of protection—children, people with developmental disabilities, and the elderly—from those made by most adults. This approach is far from what the court in *Crawford* intended and far from the evils that the Sixth Amendment was intended to thwart.

{¶ 102} The majority's holding is, in reality, an attack on Evid.R. 807,[6] which permits admission of certain hearsay statements made by child victims

---

6. Evid.R. 807(A) provides:

> An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid.R. 802 if all of the following apply:
>
> (1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.
>
> (2) The child's testimony is not reasonably obtainable by the proponent of the statement.
>
> (3) There is independent proof of the sexual act or act of physical violence.
>
> (4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement,

about physical or sexual abuse. Even though the state-law evidentiary issue is not before us, it occupied more than half of the oral-argument time in this case. The majority's insistence on undermining Evid.R. 807 wreaks havoc on our Confrontation Clause analytical framework.

{¶ 103} More troubling, the majority creates a beneficial catch-22 for pedophiles and other abusers of children. The very people who have the expertise and opportunity to recognize child abuse are now *prohibited* in Ohio from testifying about any out-of-court statements that a child makes about abuse or neglect when the child, for whatever reason, is unable to testify.

{¶ 104} Child abusers often evade prosecution because the victims are unable to disclose the abuse, let alone testify. Evid.R. 807, which applies only when the child victim's testimony is not reasonably obtainable, sought to ameliorate the difficulty in securing prosecutions in these difficult cases. Under the majority's rule, if a child victim of abuse is not able to testify, a mandatory reporter's testimony regarding the child's out-of-court statements about the abuse is barred by the Confrontation Clause. The majority is well aware that in the converse situation, when a child victim is able to testify, hearsay testimony about the abuse is then barred by Evid.R. 807.

{¶ 105} Children in Ohio will go unprotected.

{¶ 106} And the majority reaches its result by misapplying the United States Supreme Court's precedent in Confrontation Clause law. Its rationale is so faulty that it invites that court to now address the issues that it reserved in *Davis* and to provide uniform guidance on the issue of the effect, for Confrontation Clause purposes, of a duty to report child abuse. I can only hope that four justices vote to accept that invitation.

---

the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

**CONCLUSION**

{¶ 107} This case involves teachers in a classroom dealing with a common problem: an injured child. I cannot agree with the majority that the United States Supreme Court's test for statements elicited by police officers controls.

{¶ 108} I would reverse.

LANZINGER and FRENCH, JJ., concur in the foregoing opinion.

_____

Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Mark J. Mahoney, Assistant Prosecuting Attorney, for appellant.

Robert L. Tobik, Cuyahoga County Public Defender, and John T. Martin and Erika B. Cunliffe, Assistant Public Defenders, for appellee.

Michael DeWine, Attorney General, and Alexandra T. Schimmer, Solicitor General, and Samuel Peterson, Assistant Attorney General, for amicus curiae Ohio Attorney General, in support of appellant.

Timothy Young, Ohio Public Defender, and Jeremy J. Masters, Assistant Public Defender, for amicus curiae Ohio Public Defender, in support of appellee.

_____